UNITED STATES *v.* DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

No. 517.  Argued December 9, 10, 1914.—Decided June 21, 1915.

A railroad corporation engaged at the time of the passage of the Hepburn Act in the business of mining, buying, transporting and selling coal, in order to divest itself of title after the coal had been mined and before transportation began, caused a coal company to be incorporated having stockholders and officers in common with itself; thereupon the two corporations having a common management entered into a contract prepared by the railroad company under which the railroad company did not go out of the mining and selling business, but when the coal was brought to the surface it lost title by a sale to the coal company f. o. b. the mines and instantly as carrier regained possession and retained it until delivery to the coal company which subsequently paid the contract price; the price paid was a fixed percentage of the price at a stated terminal on the day of delivery at the mines, and the railroad agreed to sell all of the coal it produced or purchased from others to the coal company and the latter company agreed to buy only from the railroad company and subject to the contract; the stockholders of the railroad company were allowed to take *pro rata* the stock of the coal company and practically all availed of the option, and the coal company declared a dividend on each share of stock sufficient to pay for

the amount of stock allotted to the holder thereof.   In a suit brought by the Government alleging that the two corporations were practically one and that the contract was invalid, *held* that:

The Commodity Clause of the Hepburn Act was intended to prevent railroads from occupying the dual and inconsistent position of public carrier and private shipper; and, in order to separate the business of transportation from that of selling, the statute made it unlawful for the carriers to transport in interstate commerce any coal in which the carrier had any interest, direct or indirect.

It is not improper for a carrier engaged in mining coal to institute the organization of a coal company to buy or produce the coal so as to comply with the terms of the Commodity Clause and to give its stockholders an opportunity to subscribe to the stock, but it must dissociate itself from the management of the coal company as soon as the same starts business.

Mere stock ownership by a railroad company or by its stockholders in a producing company is not the test of illegality under the Commodity Clause but unity of management and *bona fides* of the contract between the carrier and the producer.

The Commodity Clause and the Anti-trust Act are not concerned with the interest of the parties, but with the interest of the public; and if a contract between a carrier and a producer is as a matter of law in restraint of trade, or if the producing company is practically the agent of the carrier, the transportation of the article produced by the carrier is unlawful.

The contract in this case enables the railroad company to practically control the output, sales and price of coal and to dictate to whom it should be sold and as such is illegal under both the Commodity Clause and the Anti-trust Act.

In order to comply with the Commodity Clause in regard to the transportation of coal a carrier engaged also in mining coal must absolutely dissociate itself from the coal before the transportation begins, and if it sells at the mouth of the mine, the buyer must be absolutely free to dispose of it and have absolute control, nor should a carrier sell to a corporation managed by the same officers as itself—that is contrary to the policy of the Commodity Clause.

While there might be a *bona fide* and lawful contract between a carrier mining coal and a buying company by which the latter buys all of the coal of the former, the contract to be not illegal must leave the buyer free to extend its business else-

where as it pleases and to otherwise act in competition with the carrier.

213 Fed. Rep. 240, reversed.

THE appellee was chartered not only as a Railroad Company, but was authorized to mine and sell coal. The Commodity Clause of the Hepburn Act of 1906 made it unlawful for the carrier to haul its own coal beyond the limits of the State of Pennsylvania, and desiring to continue the business of mining and transporting coal, the Railroad adopted a plan under which it was to make a sale and divest itself of title to the coal, at the mouth of the mines, before transportation began. Accordingly it caused to be incorporated, under the laws of New Jersey, the Delaware, Lackawanna and Western *Coal* Company with a capital stock of $6,800,000,—divided into shares of $50 each. The Railroad Company then invited its own stockholders to subscribe to the capital stock of the Coal Company at the rate of one share of the latter for each four shares of the former. Ninety-nine per cent. of these stockholders did, as was expected, subscribe for the stock of the Coal Company—their subscriptions being paid for in full out of a cash dividend of $13,600,000 previously declared by the Railroad Company. The new corporation was then organized by electing the Vice-President of the Railroad Company as President of the Coal Company and other officers and directors of the Coal Company were also officers and directors of the Railroad Company.

As soon as the organization was completed, the Railroad Company prepared and submitted to the Coal Company a contract by which the Railroad Company reserving what it needed for its railway locomotives 'agreed to sell and the Coal Company agreed to buy, f. o. b. the mines, all coal which, during the term of the contract, the Railroad Company should produce from its own mines or purchase from any one else.' The price for prepared sizes—the more important commercial coal—was fixed at 65 per

cent. of the price in New York on the day of delivery at the mines. The Railroad Company also leased to the Coal Company all its trestles, docks and shipping facilities.

The contract—thus prepared by the Railroad Company—was then signed by both corporations and, on August 2, 1909, the Coal Company took possession of the leased property; those who had been Agents of the Railroad in its Sales Department became Agents of the Coal Company in its Sales Department and the two corporations, with managing officers in common, also had offices in common in the City of New York.

Thereafter the Railroad Company continued its mining business, annually producing about 7,000,000 tons and purchasing about 1,500,000 tons from operators whose mines were located on its railway. After retaining what was needed for use on its railway engines, it sold the balance, aggregating about 7,000,000 tons, to the Coal Company at the contract prices f. o. b. the mines. The coal thus sold by the Railroad Company was then transported by the Railroad Company to destination where it was delivered to the Coal Company which paid the regular tariff freight rate and the contract prices on the 20th of each month. This course of dealing continued until February, 1913, when the Government filed a Petition, against both corporations, alleging that the two were practically one and attacking the validity of the contract.

The Petition alleged that the coal business was extremely profitable and in order to continue it, in all its branches, the Railroad Company (which was controlled by a group of 25 persons, owning a majority of its stock), had determined "to cause the organization of a new corporation to be under their own control—whose stockholders would be substantially the same as those of the Railroad Company—and through it to conduct the business theretofore carried on by the Railroad Sales Department, thus securing, in effect, the continued unity of

mining, transporting and selling, in substance, as theretofore and depriving the public of the benefits which the Commodity Clause was intended to produce."

The Petition alleged that when the contract was made, in August, 1909, the stockholders of the two corporations were practically identical; that a large majority of the stock in both is still owned by the same persons and that by virtue of the terms and provisions of the contract the Railroad had such an *interest* in the coal as to make it unlawful for it to transport such commodity in interstate commerce.

It was further charged that the transportation of the coal sold to the Coal Company was not only a violation of the Commodity Clause, but that the contract tended to create a monopoly and unlawfully to hinder and restrain trade in coal in violation of the provisions of the Anti-Trust Act. In this connection it was also charged that the Railroad Company not only mined coal, but purchased the product of other mines located along its railway, and had acquired the output of other collieries on its line, giving to it the disposition of more than 90 per cent. of the market, with power to arbitrarily fix prices. The Petition averred:

"By reason of the arrangements described, the support of the Railroad Company, and the peculiar advantages and facilities acquired, the Coal Company at once secured and has ever since maintained an unlawful monopoly of the sale of coal produced along defendant's railroad, and has completely dominated the markets at all points thereon not reached by any other railroad. Its position, power, and support render effective competition with it practically impossible, and the monopoly which it now holds will continue indefinitely unless restrained."

Both defendants answered. There was practically no dispute as to the facts, though both corporations contended that the facts alleged and proved did not support

the legal conclusions sought to be drawn therefrom by the Government.   Each insisted that the two corporations were separate in law and in fact; contended that the Railroad Company had no interest in the coal and insisted that the Coal Company acted independently of the Railroad Company and was not subject to its control.

At the hearing there was evidence that at the date of the making of the contract all except 2,249 shares in the Coal Company were held by those who held stock in the Railroad Company.   By reason of sales of both stocks, it appeared that in October, 1913, 88,116 shares of the Railroad stock were held by those who were not then interested in the Coal Company and 6,907 shares of stock in the Coal Company were held by those who were not owners of the Railroad stock.

There was also evidence that many of the officers of the Coal Company were not officers of the Railroad Company; that the management of the two corporations was separate and distinct; that the Coal Company kept its own books, deposited its funds in its name in banks of its own choosing, and that the profits went solely to its own stockholders.   The Coal Company paid the same rates of freight and demurrage as other shippers and received no discriminating favors from the Railroad Company.   In 1910 the amount paid to the Railroad for the purchase price of coal under the contract was about $20,000,000, and for the freight thereon about $14,000,000. Since the contract was made the Coal Company has bought coal from other persons, the quantity being 3,847 tons in 1909; 2,267 tons in 1910; 6,600 tons in 1911; 92,004 tons in 1912; 310,645 tons in the first ten months in 1913.

There are about 70,000,000 tons of anthracite coal produced annually of which 20,000,000 tons are sold at tidewater.   Of the 7,000,000 tons sold by the Delaware, Lackawanna and Western Railroad Company about

2,000,000 tons are transported to tidewater points and of this 500,000 tons are prepared sizes. The Coal Company at large expense bought land, built trestles and storage facility at various points in addition to those leased to it by the Railroad Company.

The District Court held that the business of the two corporations had not been so commingled as to make their affairs indistinguishable; that they are two distinct and separate legal beings actually engaged in separate and distinct operations and that the Railroad does not own the coal, either in whole or in part, during its carriage but has in good faith dissociated itself therefrom before the beginning of the act of transportation.

In answer to the claim that 'the Railroad will be the gainer from a high price at tide, since this will necessarily increase the price at the mines and therefore that this interest in the price is such an interest in the coal itself as is condemned by the statute,' the court said: "Undoubtedly it is correct to say that the Railroad has an interest in the price, but that 'interest' merely means that the Railroad will gain by a higher price at tide and does not mean that the Railroad has power to control the coal or the price for which it sells." The alleged power to increase the price by increasing the freight was held to be ineffective because freight rates were controlled by the Commerce Commission. "The Railroad Company does not fix prices. It does not decide how much coal is to go to New York Harbor, and it does not determine the sum for which the coal is to be sold at that point." 'The 65 per cent. basis had its origin many years ago and affords a convenient basis for calculating the price to be paid for future deliveries.' . . . The Railroad retains nothing more after the title passes to the Coal Company at the mines than an interest in the price and this is not the same thing as an interest in the coal. The Commodity Clause deals with an "in-

terest direct or indirect" in the commodities themselves and this must mean some kind or degree of ownership in the thing transported or some power to deal with it or to control it. The Railroad Company neither owns nor controls the coal after it has been loaded on the cars at the breakers. Thereafter the Coal Company is the owner and the master, and fixes prices, routes and destination at its own will.

The court further said that 'the bill of complaint makes a formal charge against both defendants under the Anti-Trust Act, but the oral argument left us under the impression that this charge was not much insisted on. For that reason the Anti-Trust Branch of the complaint was regarded as comparatively unimportant, and for that reason we shall not undertake what we think would be the needless task of discussing the evidence bearing upon the charge of restraining or monopolizing commerce. If we are mistaken in this supposition the error can easily be corrected.'

The Petition was thereupon dismissed without prejudice to the Government's right to begin a second proceeding whenever it may be so advised. 213 Fed. Rep. 240. The Government then brought the case here by appeal.

In the Government's brief it is stated that while it did not now ask for a ruling as to the right of the Railroad Company to purchase and sell coal produced in mines along its Railroad, it did ask that if the decree was affirmed it should be without prejudice to the right of the United States to institute such proceedings.

*Mr. Assistant to the Attorney General Todd* and *Mr. Solicitor General Davis* for the United States:

The Railroad Company, whilst continuing to transport in interstate commerce anthracite coal mined and purchased by it, has not in good faith dissociated itself

therefrom before the transportation, and therefore is continuing to violate the Commodities Clause.

The contract of August 2, 1909, between the Railroad Company and the Coal Company restrains interstate trade and commerce in violation of the Federal Anti-Trust Act.

In support of these contentions, see Att'y Gen'l's Rep. 1912; *Attorney General* v. *Gt. Nor. Ry. Co.*, 29 Law Jour. (N. S. Eq.) 794; *Del., Lack. & West. R. R.* v. *United States*, 231 U. S. 363; *New Haven R. R.* v. *Int. Com. Comm.*, 200 U. S. 361; *Nor. Securities Co.* v. *United States*, 193 U. S. 197; *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Tap Line Cases*, 234 U. S. 1; *United States* v. *American Tobacco Co.*, 221 U. S. 106; *United States* v. *Del. & Hud. Co.*, 164 Fed. Rep. 215; *S. C.*, 213 U. S. 266; *United States* v. *Lehigh Valley R. R.*, 220 U. S. 257; *United States* v. *Union Pacific R. R.*, 226 U. S. 61, and 470. See also 26 Stat. 209, c. 647; 32 Stat. 823, c. 544; 34 Stat. 584, c. 3591; 36 Stat. 854, c. 428.

*Mr. William S. Jenney* for appellee Railroad Company and *Mr. John G. Johnson* for appellee Coal Company:

The appellees do not maintain a monopoly in the production or sale of coal as alleged in the petition.

The Railroad Company, by a sale of its coal under the terms of the contract in issue to the Coal Company, has in good faith dissociated itself from such coal before transportation.

The contract in issue does not restrain interstate commerce.

In support of these contentions, see Att'y Gen'l's Rep., 1909, p. 57; *Id.*, 1912, p. 23; *Ansbro* v. *United States*, 159 U. S. 695; *Del., Lack. & W. R. R.* v. *United States*, 231 U. S. 363; *Paraiso* v. *United States*, 207 U. S. 368; *Rodriguez* v. *Vivoni*, 201 U. S. 371; *Rogers* v. *Ritter*, 12 Wall. 317; *United States* v. *Am. Bell Tel. Co.*, 167 U. S. 224;

*United States* v. *Cent. R. R. of N. J.*, 220 U. S. 275; *United States* v. *Del., Lack. & W. R. R.*, 213 Fed. Rep. 240; *United States* v. *Del. & Hudson Co.*, 213 U. S. 366; *United States* v. *Erie R. R.*, 220 U. S. 275; *United States* v. *Lehigh Valley R. R.*, 220 U. S. 257; *United States* v. *Pennsylvania R. R.*, 220 U. S. 275; *United States* v. *Reading Co.*, 226 U. S. 324, and 228 U. S. 158.

MR. JUSTICE LAMAR, after making the foregoing statement of facts, delivered the opinion of the court.

The Commodity Clause of the Hepburn Act was intended to prevent railroads from occupying the dual and inconsistent positions of public carrier and private shipper; and, in order to separate the business of transportation from the business of selling, that statute made it unlawful for railroads to transport in interstate commerce any coal in which the company had *"any interest, direct or indirect."* [1] *United States* v. *Delaware & Hudson*, 213 U. S. 415; *Delaware &c. R. R.* v. *United States*, 231 U. S. 363, 371.

As will be seen from the statement of facts, the Delaware, Lackawanna and Western Railroad Company was at the time of the passage of the Hepburn Act of 1906, one of the great coal roads engaged in the fourfold business of mining, buying, transporting and selling coal. As the Commodity Clause made it unlawful to transport its own coal to market, the Railway Company decided to adopt a plan by which to divest itself of title after it had

---

[1] "From and after May 1, 1908, it shall be unlawful for any railroad company to transport" [in interstate commerce] "any article or commodity other than timber . . . manufactured, mined or produced by it, or under its authority, or which it may own in whole, or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier." 34 Stat. 585.

been mined but before transportation began. It thereupon caused a Coal Company to be incorporated having stockholders and officers in common with the Railroad Company. The two corporations, thus having a common management, then made a contract—prepared by the Railroad Company—under which the Railroad Company did not go out of the mining and selling business, but when the coal was brought to the surface the Railroad Company lost title by a sale to the Coal Company f. o. b. the mines and instantly regained possession as carrier. It retained that possession until delivery to the Coal Company, which subsequently paid therefor at the contract price.

The District Court held that it was illegal for the same person to own a majority of the stock in the two corporations and that their contract of sale was lawful.

From the decree, dismissing the Bill, the Government appealed to this court where much of the argument was directed to the question as to whether the fact that the two corporations had practically the same shareholders left the Railroad Company in a position where it could lawfully transport coal which it had sold at the mouth of the mine to the Coal Company.

1. But mere stock ownership by a Railroad, or by its stockholders, in a producing Company cannot be used as a test by which to determine the legality of the transportation of such Company's coal by the interstate carrier. For, when the Commodity Clause was under discussion, attention was called to the fact that there were a number of the anthracite roads which at that time owned stock in coal companies. An amendment was then offered which, if adopted, would have made it unlawful for any such Road to transport coal belonging to such Company. The amendment, however, was voted down; and, in the light of that indication of Congressional intent, the Commodity Clause was construed to mean that it was not necessarily

unlawful for a railroad company to transport coal belonging to a Corporation in which the Road held stock. *United States* v. *Delaware & Hudson Co.*, 213 U. S. 414. For a stronger reason, it would not necessarily be illegal for the Road to transport coal belonging to a Corporation whose stock was held by those who owned the stock of the Railroad Company.

Nevertheless, the Commodity Clause, of the Hepburn Act of 1906, rendered unlawful many transactions which prior to that time had been expressly authorized by the statutes of the States which had chartered the Coal Roads. And, while the Hepburn Act provided that, in the future, interstate railroads should not occupy the dual position of carrier and shipper, there was, of course, no intent on the part of Congress to confiscate property or to destroy the interest of the stockholders. But, still, upon adoption of the Commodity Clause, this appellee Railroad was confronted with a difficult situation. To shut down the mines, because the coal could not be transported, would have meant not only a vast monetary loss to the Company and its stockholders, but would have been even more harmful to the interests of the public which required a constant supply of fuel. The character of coal property was such as to make it impossible to divide the same in kind among the railroad stockholders, while the value of the coal land was so great as to make it impracticable to find a purchaser in ordinary course of trade. It was, therefore, natural, if not necessary, to organize a corporation with which a contract could be made, and out of cash received or stock issued to pay for or preserve the equity which the railroad shareholders had in the coal.

In this situation there may have been no impropriety in the Railroad Company taking the preliminary steps of organizing such a corporation. Neither was it illegal for the stockholders of the Railroad Company to take stock in the Coal Company, for there are many instances

in which the law recognizes that there may be diversity of corporate interest even when there is an identity of corporate members. A city and the county, in which it is located, may both have the same population but different corporate interests. Many private corporations have both stockholders and officers in common, yet they may nevertheless make contracts which will bind both of the separate entities. But whenever two such companies, thus owned or managed, make contracts which affect the interest of minority stockholders, or of third persons, or of the public the fact of their unity of management must be considered in testing the validity and *bona fides* of the contracts under review.

2. That principle is to be specially borne in mind in the present case. For this is not an instance of a Coal Road and a Coal Company, both of which existed and had made contracts prior to the Commodity Clause;—but a case where a Coal Company was created with the express purpose that, with stockholders in common, it should be a party to a contract intended to enable the Railroad Company to meet the requirements of the Commodity Clause and at the same time continue the business of buying, mining, selling and transporting coal.

It is also to be noted that the Delaware, Lackawanna and Western Railroad Company did not part with title to its coal lands, mines and mining machinery as seems to have been done, on terms not fully stated [*United States* v. *Delaware & Hudson*, 213 U. S. 366, 398 (5), 392], in some of the instances discussed in the Commodity Cases. In them the ownership of the mines had passed completely from the railroads to the producing companies and the coal property was no longer subject to the debts of the railroad companies. After such sale of the coal lands there was both a technical and a practical separation of the legal interest of the two corporations in the coal under the ground, on the surface, when it was transported, and

when it was sold.  The fact that the Railroad held stock in the producing company, and received dividends thereon, did not give to the Railroad Company, any more than to any other stockholder in any other corporation, a legal interest in the property of the Coal Company.  Nor would the fact that the Railroad Company had once owned it, have made any difference, if,—by a normal and *bona fide* sale at the point of production,—the carrier had lost all power of control and all right, title and interest in the coal before the transportation began.  *United States* v. *Delaware & Hudson*, 213 U. S. 413, top.

3. But the decisions construing the statute, recognize that one corporation can be an agent for another corporation and that by means of stock ownership one of such companies may be converted into a mere agent or instrumentality of the other.  *United States* v. *Lehigh Valley R. R.*, 220 U. S. 257, 273.  And, this use of one by the other—or this power of one over the other—does not depend upon control by virtue of the fact that stock therein is held by the Railroad Company or by its shareholders.  For dominance of the Coal Company may be secured by a carrier (*New Haven R. R.* v. *Int. Com. Comm.*, 200 U. S. 363) not only by an express contract of agency, but by any contract which in its practical operation gives to the Railroad Company a control or an "interest, direct or indirect" in the coal sold, at the mouth of the mines.

Assuming then that the incorporation and organization of the Coal Company under the auspices of the Railroad Company was legal; assuming that the election of railroad officers as the first managers of the Coal Company was not illegal; assuming that as officers of the Railroad they could contract with themselves as officers of the Coal Company; assuming that at the time of organization it was not unlawful for the Railroad Company and the Coal Company, not only to have officers but offices in common, and finally assuming that all these

facts together did not, in and of themselves, establish an identity of corporate interest, still these facts taken together are most significant. They at least prove that the relation between the parties was so friendly that they were not trading at arm's length. And the further fact that one of the parties was under a statutory disability as to hauling coal makes it necessary to carefully scrutinize their arrangement in order to determine whether it was a *bona fide* and lawful contract of sale, or a means by which the Railroad though parting with the legal title retained an interest and control in what had been sold.

4. That contract is published in full in 213 Fed. Rep. 255–259. The provisions material in the present inquiry may be thus summarized:

(a) The Railroad Company agreed to sell and the Coal Company agreed to buy all of the coal mined or acquired by the Railroad Company during the continuance of the contract; (b) the price for the more important commercial grades was to be 65 per cent. of the New York price on the day of delivery; (c) the amount of coal to be sold and delivered was at the absolute option of the Railroad Company as its interests might determine; (d) the Coal Company was not to buy coal from any other person or corporation without the written consent of the Railroad Company; (e) the Coal Company was to conduct the selling of the coal so as best to conserve the interests, good-will and markets of the coal mined by the Railroad Company; (f) the Coal Company was to continue to fill the orders of present responsible customers of the Railroad Company, even if some of such sales might be unprofitable; (g) the Railroad leased to the Coal Company all of its trestles, docks and shipping facilities at a rental of 5 per cent. of their value; (h) the contract could be terminated by either party on giving six months' notice.

The most cursory examination of the contract shows that—while it provides for the sale of coal before transportation begins—it is coupled with onerous and unusual provisions which make it difficult to determine the exact legal character of the agreement.   If it amounted to a Sales Agency the transportation was illegal because the Railroad Company could not haul coal which it was to sell in its own name or through an agent.   If the contract was in restraint of trade it was void because in violation of the Sherman Anti-Trust Law.   The validity of the contract cannot be determined by consideration of the single fact that it did provide for a sale.   It must be considered as a whole and in the light of the fact that the sale at the mine, was but one link in the business of a Railroad engaged in buying, mining, selling and transporting coal.

5. By virtue of the fact that the Railroad Company bought, mined and sold, it—like any other dealer—was interested in maintaining prices, since the contract did not fix a definite sum to be paid for all of the coal sold, but provided that the Railroad Company was to receive 65 per cent. of the New York price on the day the coal was loaded into the cars.   The higher the rate in New York the better for the seller.   And, by the contract, the Railroad reserved a power which, when exercised, could not only curtail production but shipments.   Thus by decreasing the amount transported the supply in New York could be lessened.   This would tend to raise New York prices and thus increase the sum the Railroad was to receive.

The Railroad Company was in the business of selling, and it is not to be presumed that its power to limit deliveries or to prevent the Coal Company from obtaining coal elsewhere would be often exercised.   Yet the power did exist and it was reserved for some purpose—not, as argued, to prevent controversy as to failure to deliver

in cases of strikes or accidents, for such is not the language or intent of the contract. Nor is room left for the implication [necessary to the validity of such an exclusive contract, *Chicago &c. R. R.* v. *Pullman,* 139 U. S. 80 (3), 89, 90], that the seller would deliver reasonable amounts at reasonable times. All such defensive arguments are excluded by the express and emphatic terms of the contract that "the amount of coal to be so delivered and sold to the buyer by the seller shall be at the absolute option of the seller as its interests may determine, and the seller shall be subject to no liability whatsoever for failure to supply the buyer with such amount of coal as it may desire."

It might be said that if such a power was exercised the Coal Company could then go into the market and purchase from other coal dealers. But this contract deprives the buyer even of that ordinary business privilege, declaring that the Coal Company "will purchase all coal to be sold by it from the seller, and will purchase no coal from any other person or corporation, except with the written consent of the seller."

6. Reading these two clauses together, it is evident that the Coal Company was neither an independent buyer nor a free agent. It was to handle nothing except the Railroad's coal and was the instrument through which the Railroad sold all its product. The Coal Company, though incorporated to do a general coal business, was dependent solely upon the Railroad for the amount it could procure and sell and was absolutely excluded from the right to purchase elsewhere without the consent of the Railroad Company, which, however, was under no corresponding obligation to supply any definite amount at any definite date.

Restrictive contracts should at least be reciprocal and mutual—for if A is bound to purchase only from B the latter should certainly be bound to furnish what A wishes to buy [*Chicago &c. R. R.* v. *Pullman,* 139 U. S. 80

(3), 89, 90]—especially is this true when the subject of the contract is an article in which the public is interested. Even at common law, in passing upon the validity of contracts in restraint of trade, the "public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires the contract may be sustained." *Gibbs* v. *Baltimore Consolidated Gas Co.*, 130 U. S. 396, 409; *Fowle* v. *Park*, 131 U. S. 97.

In this case the subject of the contract was anthracite coal—an article of public necessity and of limited supply, one-tenth being controlled by the appellee. The Railroad Company might have justly insisted on contract provisions intended to secure payment for all that it produced. But going beyond what was required for its own protection, it restrained the Coal Company from buying from anyone else, and,—what is probably more significant in this case—thereby prohibited the Coal Company from competing with the Railroad Company for the purchase of coal mined on the Railroad lines. And, this was not a mere perfunctory provision, because the Railroad Company was a buyer of coal and purchased 1,500,000 tons per annum from mines on its system. By this contract it excluded from that market the Coal Company, which, with its capital of $6,000,000, could have been a strong competitor. Such a provision may not have actually effected a monopoly. But considering the financial strength of the carrier; its control of the means of transportation; its powers to fix the time when transportation of the very coal sold was to begin; its power in furnishing cars to favor those from whom it bought or to whom it sold—such a contract would undoubtedly have that tendency. In that respect it was opposed to that policy of the law, which was the underlying reason for the adoption of the Commodity Clause. *New Haven R. R.* v. *Int. Com. Comm.*, 200 U. S. 373.

7. There is another provision of the contract which shows that the Railroad had such an interest in the coal as enabled it to dictate to whom it should be sold, even at unprofitable prices. The agreement provides:

"Sixth. The buyer agrees that it will conduct the business of selling the coal of the seller in such manner as best to conserve the interests of and preserve the good will and markets of the coal mined by the seller, and to continue to fill the orders of all responsible present customers of the seller even though as to some of such customers the sales may be unprofitable, it being understood and agreed that at the prices above quoted the entire business of the buyer will be conducted at a profit."

This is not a mere stipulation that the Coal Company would not injure the reputation of the Railroad Company's coal; while the further provision that the Coal Company would 'continue to fill the orders of all responsible present customers, even though some of such sales might be unprofitable,' was a further indication of the fact that both parties recognized the Railroad had an interest in the coal' and used the Coal Company to preserve and secure that interest even after transportation began.

The unusual, onerous and restrictive terms imposed by this contract may, as between the parties, have been negligible—certainly so as long as the stockholders remained the same, since a loss to the Coal Company would be presumably represented by a gain to the Railroad Company. But the Commodity Clause and the Anti-Trust Act are not concerned with the interest of the parties but with the interest of the public and it, therefore, makes no difference whether this contract dictated by the Railroad Company was for the permanent advantage of the Coal Company.

8. It is argued, however, that the contract has not operated to the injury of the parties or of the public.

And, in answer to those urged by the Government, it is said that some of the objections now insisted on were not pressed in the lower court; that there is no complaint that the Railroad charged the Coal Company exorbitant prices; or, that it ever raised the New York prices; or, that it failed to make prompt deliveries; or, that it has prevented the Coal Company from buying coal from other operators; or, that the Railroad monopolized the coal mined on its railway, or that it deprived such mining companies of an open market. From this it is argued that the present objections to the contract are purely academic. But its validity depends upon its terms. And if, as a matter of law, the contract is in restraint of trade, or, if the Coal Company is practically the agent of the Railroad Company then the transportation of the coal by the latter is unlawful.

9. As already pointed out, the contract has in it elements of a sale and elements of a sales agency. It provides that the Railroad Company will sell and that the Coal Company will buy all coal that is mined during the continuance of the contract; but it prevents the Coal Company from buying from any one else. It requires it to sell to present railroad customers at the old price, even though those prices may be unprofitable. The seller is not bound to make deliveries of fixed quantities at fixed dates and by decreasing what it will sell and determining when it will ship it has a power in connection with its power as a carrier, which, if exerted, would tend to increase prices in New York. Besides all this, the contract prevents the Coal Company from competing with the Railroad Company in the purchase of coal along the railway line. Taking it as a whole and bearing in mind the policy of the Commodity Clause to dissociate the Railroad Company from the transportation of property in which it is interested and that the Sherman Anti-Trust Act prohibits contracts in restraint of trade,

there would seem to be no doubt that this agreement violated both statutes.

10. The Railroad Company, if it continues in the business of mining, must absolutely dissociate itself from the coal before the transportation begins. It cannot retain the title nor can it sell through an Agent. It cannot call that Agent a buyer while so hampering and restricting such alleged buyer as to make him a puppet subject to the control of the Railroad Company. If the Railroad sells coal at the mouth of the mines to one buyer or to many it must not only part with all interest direct or indirect in the property but also with all control over it or over those to whom the coal is sold at the mines. It must leave the buyer as free as any other buyer who pays for what he has bought. It should not sell to a corporation with officers and offices in common,—for the policy of the statute requires that instead of being managed by the same officers, they should studiously and in good faith avoid anything, either in contract or conduct, that remotely savors of joint action, joint interest or the dominance of one Company by the other. If the seller wishes—by a lawful and *bona fide* contract, whose provisions as to delivery and otherwise are not in restraint of trade—to sell all of its coal to one buying company, then that one buyer can be bound by reasonable terms and required to pay according to the contract. But such buyer should otherwise be absolutely free to extend its business to buy when, where and from whom it pleases, and otherwise to act as an independent dealer in active competition with the Railroad Company.

What has been said is sufficient to show that the contract was invalid. That makes it unnecessary to discuss other questions raised but not disposed of by the District Court, and the decision herein is without prejudice to the right of the United States to institute proceedings

in reference thereto or to test the right of the Railroad Company to purchase coal for sale.

The decree is reversed with directions to enter a decree enjoining the Railroad from further transporting coal sold under the provisions of the contract of August 2, 1909, referred to in the Petition.

*Reversed.*

MR. JUSTICE McREYNOLDS took no part in the decision of this case.