## UNITED STATES v. ELGIN, J. & E. RY. CO.

### No. 10152.

District Court, N. D. Illinois, E. D.
July 1, 1935.

Elmer B. Collins, Sp. Asst. to Atty. Gen., Burt L. Smelker; of Washington, D. C., Atty., Interstate Commerce Commission, Harold M. Stephens, Asst. Atty. Gen., Carl McFarland, Sp. Asst. to Atty. Gen., and Dwight H. Green, U. S. Atty., of Chicago, Ill., for the United States.

Nathan L. Miller, of New York City, and Kemper K. Knapp, of Chicago, Ill. (Frank B. Kellogg, of St. Paul, Minn., Charles S. Belsterling, of New York City, and Knapp, Beye, Allen & Cushing, of Chicago, Ill., of counsel), for defendant.

WOODWARD, District Judge.

This suit was brought in the name of the United States against the Elgin, Joliet & Eastern Railway Company to enjoin and restrain it from transporting in interstate commerce any article or commodity (with exceptions not material to this case) manufactured, mined, or produced by or under the authority of certain subsidiaries of the United States Steel Corporation (hereinafter referred to as the Steel Corporation) in which such subsidiaries own or have an interest.

The suit is based on section 1 (8) of the Interstate Commerce Act (34 Stat. 584, 49 USCA 1 (8), commonly known as the commodities clause, which reads as follows: "It shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect, except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

Defendant is a corporation railroad company, organized under the laws of the state of Illinois and Indiana, and maintains its principal office at Chicago, Ill. It is a common carrier engaged in the transportation of property (but not passengers) in interstate commerce, and is subject to all the provisions of the Interstate Commerce Act (49 USCA § 1 et seq.). It operates a line of railroad extending from Waukegan, Ill., to Joliet, Ill., thence easterly to Porter, Ind., forming what is known as the "Chicago Outer Belt Line." It also operates a line extending from Griffith, Ind., to South Chicago, Ill., which serves the cities of Gary, Buffington, Indiana Harbor, Whiting, and Hammond, Ind. It also operates branch lines which extend from Normantown, Ill., to Aurora, Ill. It also operates its engines, trains, and cars over such of the lines of the Chicago, Lake Shore & Eastern Railway Company as extend from Chicago Heights, Ill., to Rossville Junction, Ill., a distance of 80 miles, and, in addition thereto, over such of the lines of the Chicago & Eastern Illinois Railroad Company as extend from Rossville Junction to Jackson, Ind., a distance of 53.10 miles; from Danville, Ill., to Sidell Junction, Ill., a distance of 22.20 miles; and from Sidell Junction to Rossville Junction, a distance of 34.40 miles. Its present authorized capital stock is $10,000,000.

The Steel Corporation was organized February 25, 1901, under the laws of the state of New Jersey. In 1901 the Steel Corporation acquired and now owns all the capital stock of the defendant. The Steel Corporation owns, directly or indirectly, all the capital stock of its several manufacturing, mining, and producing subsidiaries; the total amount and the ownership of the issued and outstanding capital stock of each being as follows:

| Subsidiaries | Capital stock issued | Amount owned by Steel Corporation |
|---|---|---|
| Elgin, Joliet and Eastern Railway Company.......(C) | $10,000,000 | $10,000,000 |
| Chicago, Lake Shore and Eastern Railway Company .....................(C) | 9,000,000 | [1] |
| Illinois Steel Company....(C) | 18,650,600 | 18,650,600 |
| American Bridge Company .....................(C) | 10,000,000 | 10,000,000 |
| American Sheet & Tin Plate Company.........(C) | 24,500,000 | 24,500,000 |
| (P) | 24,500,000 | 24,500,000 |
| American Steel & Wire Company ................(C) | 50,000,000 | 50,000,000 |
| (P) | 40,000,000 | 40,000,000 |
| Federal Steel Company...(C) | 46,484,300 | 46,484,200 |
| (P) | 53,260,900 | 53,260,900 |
| National Tube Company..(C) | 45,000,000 | 45,000,000 |
| (P) | 40,000,000 | 40,000,000 |
| Universal Atlas Cement Company ................(C) | 3,500,000 | 2,500,000 [2] |
| United States Fuel Company .....................(C) | 3,600,000 | [3] |
| United States Coal & Coke Company..........(C) | 12,500,000 | 10,500,000 [4] |

The Steel Corporation is not a manufacturing or producing company, but is a holding company.

[1] $9,000,000 owned by Illinois Steel Company.

[2] Balance of $1,000,000 owned by Illinois Steel Company.

[3] $3,600,000 owned by Federal Steel Company.

[4] Balance of $2,000,000 owned by Illinois Steel Company.

438

The railroad of defendant connects various plants of the subsidiaries of the Steel Corporation with each other. Its function in that regard is to interchange the products of such subsidiaries with each other. Its railroad also connects the plants of these subsidiaries with all the great railroad systems entering the city of Chicago. Its function in that regard is to transport the products of these subsidiaries to and into the streams of commerce so that they may reach every part of the country. The defendant transports, and has transported, in interstate commerce, a vast tonnage of articles and commodities manufactured, mined, produced, or owned by the Steel Corporation's subsidiaries. In addition, it carries on a large transportation business with shippers who are in no way connected with or related to the Steel Corporation or its subsidiaries.

Further facts will be stated in the opinion.

Under the commodities clause, transportation is made unlawful only when two things concur: (1) The transportation must be by a railroad company; and (2) the commodities transported must be produced by or under the authority of the railroad company transporting them, or such railroad company so transporting them must own or have an interest in the commodities transported. U. S. v. Delaware & Hudson Co., 213 U. S. 366, 408, 29 S. Ct. 527, 53 L. Ed. 836.

The defendant does not transport articles or commodities which it produces, mines, or manufactures. The defendant is a regularly incorporated railroad company. The articles or commodities which it is alleged are transported illegally are produced or manufactured by other incorporated companies. The bond of connection is that the stock of the railroad company and the stock of the producing and manufacturing company are owned by a single corporation, namely, the Steel Corporation.

The question presented is, therefore, a narrow one. It is contended that the defendant comes within the prohibition of the statute because the Steel Corporation has exercised such management, domination, control, direction, and co-ordination over the defendant and the producing and manufacturing subsidiaries of the Steel Corporation as to establish in the defendant an "interest, direct or indirect" in the articles or commodities transported. In

other words, it is contended that the Steel Corporation has exercised such dominion and control over both the defendant and the producing and manufacturing subsidiaries as to destroy the separate corporate entities and to reduce all corporations to one.

The Supreme Court has interpreted and applied the commodities clause in several decisions. These decisions are relied upon by both parties in this case, and are as follows: U. S. v. Delaware & Hudson Co., 213 U. S. 366, 29 S. Ct. 527, 538, 53 L. Ed. 836 (1909); U. S. v. Lehigh Valley R. R. Co., 220 U. S. 257, 31 S. Ct. 387, 55 L. Ed. 458 (1911); U. S. v. Delaware, Lackawanna & Western R. R. Co., 238 U. S. 516, 35 S. Ct. 873, 877, 59 L. Ed. 1438 (1915); U. S. v. Reading Co., 253 U. S. 26, 40 S. Ct. 425, 434, 64 L. Ed. 760 (1920). Both parties maintain that the Supreme Court, in the above-cited cases, and particularly in the Lehigh and Reading Cases, has laid down the rules for testing the situation disclosed by the record in this case.

The constitutional validity of the commodities clause was asserted in the Hudson Case. In the Hudson Case, several cases were considered together. In some of the cases it appeared that the railroad company owned the stock of a mining company, the coal of which it transported. After holding that the commodities clause was constitutional, the court proceeded to its construction and interpretation. In holding that a railroad company does not violate the commodities clause by transporting coal mined by a corporation in which the railroad company owns the stock, the court, in construing the clause, used this language: "We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions: (a) When the article or commodity has been manufactured, mined, or produced by a carrier or under its authority, and, at the time of transportation, the carrier has not, in good faith, * * * dissociated itself from such article or commodity; (b) When the carrier owns the article or commodity to be transported, in whole or in part; (c) When the carrier, at the time of transportation, has an interest, direct or indirect, in a legal or equitable sense, in the article or commodity, not including, therefore, articles or commodities manufac-

tured, mined, produced, or owned, etc., by a bona fide corporation in which the railroad company is a stockholder."

It may, therefore, be considered, as settled by the decision in the Hudson Case, that the ownership by a railroad company of the stock of a producing or manufacturing company whose articles or commodities the railroad company transports would not, of itself, and without more, subject the railroad company to the penalties of the commodities clause. In such case, the railroad company would not have an interest, direct or indirect, legal or equitable, in the articles or commodities transported.

All the cases involved in the Hudson decision were reversed and remanded, with direction for such further proceedings as may be necessary to apply and enforce the statute. Among the cases reversed and remanded was U. S. v. Lehigh Valley R. R. Co. After the case was remanded, the government presented an amended bill and asked leave to file it, which leave was refused and the bill dismissed. The case then went again by appeal to the Supreme Court (U. S. v. Lehigh Valley R. R. Co., 220 U. S. 257, 31 S. Ct. 387, 389, 55 L. Ed. 458). On appeal the court held that the proposed amended bill was germane to the original bill. As to the case presented by the amended bill, the court says:

"The amendment contained copious averments in regard to the actual relations existing between the railroad company and one of the coal companies mentioned in the original bill, viz., the Lehigh Valley Coal Company. In substance it was averred that as to this particular coal company, the railroad company was not only the owner of all the stock issued by the coal company, but that the railroad company so used the power thus resulting from its stock ownership as to deprive the coal company of all real, independent existence, and to make it virtually but an agency or dependency or department of the railroad company. In other words, in great detail facts were averred which tended to establish that there was no distinction in practice between the coal company and the railroad company, the latter using the coal company as a mere device to enable the railroad company to violate the provisions of the commodities clause. It was expressly charged that in consequence of these facts:

" 'The coal company is not a bona fide mining company, but is merely an adjunct or instrumentality of the defendant. The defendant is in legal effect the owner of and has a pecuniary interest in the coal mined by the coal company, and which is transported by the defendant.' "

The amended bill contained other averments tending to show domination and control of the coal company by the railroad company.

The court reaffirmed its holding in the Hudson Case. While the court reaffirmed its holding in the Hudson Case, yet there was "nothing in that conclusion foreclosed the right of the government to question the power of a railroad company to transport in interstate commerce a commodity manufactured, mined, owned, or produced by a corporation in which the railroad held stock, and where the power of the railroad company as a stockholder was used to obliterate all distinctions between the two corporations. That is to say, where the power was exerted in such a manner as to so commingle the affairs of both as by necessary effect to make such affairs practically indistinguishable, and therefore to cause both corporations to be one for all purposes."

The court also held that: "The use of such stock ownership in substance for the purpose of destroying the entity of a producing, etc., corporation, and of commingling its affairs in administration with the affairs of the railroad company, so as to make the two corporations virtually one, brings the railroad company voluntarily acting as to such producing, etc., corporation within the prohibitions of the commodities clause. In other words, that by operation and effect of the commodities clause there is a duty cast upon a railroad company proposing to carry in interstate commerce the product of a producing, etc., corporation in which it has a stock interest, not to abuse such power so as virtually to do by indirection that which the commodities clause prohibits,—a duty which plainly would be violated by the unnecessary commingling of the affairs of the producing company with its own, so as to cause them to be one and inseparable."

The court also used this language: "The right of a railroad company as a stockholder to use its stock ownership for the purpose of a bona fide separate administration of the affairs of a corporation in which it has a stock interest may not be denied."

The principle announced in the Lehigh Case, reaffirmed in the Reading Case, here-

tofore referred to, and controlling in this case, is that if a railroad company owns all the stock of a producing or manufacturing company and then so controls the producing or manufacturing company as to obliterate the producing or manufacturing company of all really independent existence and making it a mere agent or department of the railroad, then the railroad company does have an interest within the commodities clause in the article or commodity produced or manufactured by the producing or manufacturing company. If the railroad company, by reason of its stock ownership in a producing or manufacturing company, so uses that control as "to make the two corporations virtually one," that is to say, "so as to cause them to be one and inseparable," then the railroad company is brought within the commodities clause; otherwise not.

■ In the Lackawanna Case, the court held that under the facts averred in the bill the coal company, the stock of which was owned by the railroad company, was a mere agent or instrumentality of the railroad company. Again the court affirmed the principle that the union, in one unit, of stock of a railroad company and of stock of a producing or manufacturing company, whose products the railroad company transports, does not bring the case within the commodities clause; the court using the following language: "But mere stock ownership by a railroad, or by its stockholders, in a producing company, cannot be used as a test by which to determine the legality of the transportation of such company's coal by the interstate carrier. For, when the commodity clause was under discussion, attention was called to the fact that there were a number of the anthracite roads which at that time owned stock in coal companies. An amendment was then offered which, if adopted, would have made it unlawful for any such road to transport coal belonging to such company. The amendment, however, was voted down; and, in the light of that indication of congressional intent, the commodity clause was construed to mean that it was not necessarily unlawful for a railroad company to transport coal belonging to a corporation in which the road held stock. United States v. Delaware & Hudson Co., 213 U. S. [366], 414, 29 S. Ct. 527, 53 L. Ed. [836], 851. For a stronger reason, it would not necessarily be illegal for the road to transport coal belonging to a cor-

poration whose stock was held by those who owned the stock of the railroad company."

The case principally relied upon by the government is the Reading Case. That case was brought to dissolve the intercorporate relations existing between the corporation defendants for the reason that through such relations trade was restrained, the Anti-Trust Act and the commodities clause violated. The Reading Company was a holding company. It owned all the stock of a railroad company as well as all the stock of a coal company. The railroad company transported the coal produced and mined by the coal company. The holding company, the railroad company, and the coal company had the same officers, directors, and managers, and all three companies were operated as one concern. The court used this language: "All three of the Reading Companies had the same officers and directors and it was under their authority that the mines were worked and the railroad operated, and they exercised that authority in the one case in precisely the same character as in the other—as officials of the Holding Company. The manner in which the stock of the three was held resulted and was intended to result, in the abdication of all independent corporate action by both the Railway Company and the Coal Company, involving as it did the surrender to the Holding Company of the entire conduct of their affairs. It would be to subordinate reality to legal form to hold that the coal mined by the Coal Company, under direction of the Holding Company's officials, was not produced by the same 'authority' that operated the Reading Railway lines."

The Reading Railroad, prior to its reorganization in 1896, in an effort to monopolize the anthracite coal trade in the anthracite region of Pennsylvania, had bought up many anthracite coal mines. Upon reorganization the holding company stripped the railroad of property that it was necessary for it to have in order to perform its common carrier service. It took over title to all of its terminals, equipment, engines, cars, and ships. The holding company was thus enabled to control the common carrier service and disabled the railroad from performing such service without its aid. The court characterized the situation as follows: "By the plan of reorganization adopted it was disabled from performing its functions as a carrier, except with the

aid of the Holding Company, for all of the equipment, engines, cars and ships, owned by the former Railroad Company, and its tidewater terminals at Philadelphia and on New York Harbor, were allotted to the Holding Company."

The properties of the holding company, the railroad company, and the coal company were combined for a single bond issue. The earnings "were to be distributed not in proportion to the shares of their capital stocks, aggregating $28,000,000, but were to go to the creditors and shareholders of the Holding Company, with its mortgage debt of $135,000,000 and its capital stock of $140,000,000. The Holding Company thus served to pool the property, the activities and the profits of the three companies."

In view of the facts before the court in the Reading Case, it was held that both the railroad company and the coal company abdicated all independent corporate action and surrendered to the holding company the entire conduct of their affairs. The court looked through the form to the substance and found that the domination and control of the holding company over the railroad company and over the coal company was complete. The court say that the "Holding Company had continued in active, dominating control of the Reading Railway Company and of the competing Central Railroad System, and also of the two coal companies, thus effectually suppressing all competition, between the four companies and pooling their earnings."

The court further found that the plan of a holding company holding the stock of the railroad company and the stock of the coal company was adopted "for the purpose, of evading the provision of the Constitution of Pennsylvania * * * and * * * the provisions of the federal Anti-Trust Act."

The language of the opinion must be construed as relating to the facts then before the court, and is as follows:

"In terms the act declares that it shall be unlawful for any railroad company to transport in interstate commerce 'any article or commodity * * * mined or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest, direct or indirect.'

"Accepting the risk of obscuring the obvious by discussing it, and without splitting hairs as to where the naked legal title to the coal would be when in transit, we may be sure that it was mined and produced under the same 'authority' that transported it over the railroad. All three of the Reading companies had the same officers and directors and it was under their authority that the mines were worked and the railroad operated, and they exercised that authority in the one case in precisely the same character as in the other—as officials of the Holding Company. The manner in which the stock of the three was held resulted and was intended to result, in the abdication of all independent corporate action by both the Railway Company and the Coal Company, involving as it did the surrender to the Holding Company of the entire conduct of their affairs. It would be to subordinate reality to legal form to hold that the coal mined by the Coal Company, under direction of the Holding Company's officials, was not produced by the same 'authority' that operated the Reading Railway lines. The case falls clearly within the scope of the act, and for the violation of this commodity clause, as well as for its violation of the Anti-Trust Act, the combination between the Reading Railway Company and the Reading Coal Company must be dissolved."

The railroad company, in the Reading Case, did not meet the condemnation of the court simply for the reason that its stock and the stock of the coal company was held by the holding company. It was not the ownership of the stock by the holding company, but the manner of the use of that stock for purposes of domination and control, that was the determining factor. The mere intervention of a holding company did not bring the railroad within the condemnation of the statute. The whole scheme, in the Reading Case, was designed and used for the purpose of monopoly and for evading, in form, the commodities clause. In the Reading Case, the distinction between all corporate entities was obliterated. For all practical purposes the three companies were one and inseparable. The coal was in fact transported by the same "authority" that mined and marketed it. The court, therefore, summarized the law upon this subject in the following language: "It results that it may confidently be stated that the law upon this subject now is that while the ownership by a railroad company of shares of the capital stock of a mining company does not nec-

442

essarily create an identity of corporate interest between the two such as to render it unlawful under the commodities clause for the railroad company to transport in interstate commerce the products of such mining company, yet where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require. United States v. Lehigh Valley R. R. Co., 220 U. S. 257, 272, 273, 31 S. Ct. 387, 55 L. Ed. 458; United States v. Delaware, Lackawanna & Western R. R. Co., 238 U. S. 516, 529, 35 S. Ct. 873, 59 L. Ed. 1438; Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Association, 247 U. S. 490, 501, 38 S. Ct. 553, 62 L. Ed. 1229."

The cases construing and interpreting the commodities clause are in perfect harmony. Irrespective of form, if the facts in a given case show that a railroad company occupies the inconsistent position of carrier and shipper, then the railroad company is violating the commodities clause.

The question is one of fact. Do the facts in the instant case show that the defendant occupies such inconsistent position?

The facts, as disclosed by this record, may be summarized as follows:

(1) The defendant has not transported in interstate commerce any article or commodity (other than timber and the manufactured products) which actually, as a matter of fact, was manufactured, mined, or produced by it or under its authority, or which actually, as a matter of fact, was owned in whole or in part by it or in which it actually, as a matter of fact, had an interest, direct or indirect, except such articles or commodities as were necessary and intended for its use in the conduct of its business as a common carrier.

(2) The primary business of defendant is that of a common carrier. Its other acts and transactions were incidental to its primary business of transportation. The United States Steel Corporation never took any part in transporting any commodities over the railroad of the defendant or in op-

erating or in managing the operation of defendant's railroad or of any of the facilities of such operations or gave any directions or exercised any control over the transportation conducted over the railroad of defendant or took any part in any of the transactions between the defendant and the shippers over its railroad.

(3) The existence and free functioning of defendant as a common carrier railroad corporation and a separate corporate entity was not destroyed or obstructed or interfered with by the United States Steel Corporation; neither was the public recognition of defendant as a common carrier railroad company concealed, obscured, or given any particular character to distinguish it from other common carrier railroads by anything done by the United States Steel Corporation.

(4) All communications and conferences between representatives of the United States Steel Corporation and representatives of defendant, whether properly characterized as orders, requests, advice, or the exercise of control, and whether originating with the United States Steel Corporation or with defendant, related solely to the internal affairs of the defendant and to the relations between United States Steel Corporation and defendant, and did not relate to the transaction by defendant of its transportation business or the relation between the defendant and those for which it performed transportation business.

(5) Defendant regularly filed and published tariff rates covering the transportation services performed by it in accordance with the provisions of the law. In the conduct of its transportation business defendant did not discriminate against or in favor of any of its patrons either in service or in charges, but treated all alike and in accordance with its filed and published tariffs.

(6) The defendant did not contribute any property or labor or exercise any authority in, or take any part in manufacturing, mining, or producing any of the commodities transported by it or own, in whole or in part, or acquire any interest, direct or indirect, in any of the commodities transported by it (other than timber and the manufactured products thereof and such articles and commodities as were necessary and intended for its use in the conduct of its business as a common carrier).

(7) All transactions and communications between United States Steel Corpo-

ration and defendant were carried on in the form of transactions and communications between two separate and distinct corporations, and in such transactions and communications neither the two corporations nor their affairs were merged or mixed.

(8) Defendant conducted all of its affairs in its own name for itself and in the manner and form of a corporation.

(9) The United States Steel Corporation did not conduct for defendant any of its business affairs between defendant and any other persons or corporation, but defendant conducted all of its business affairs through and by its own officers and employees and not through, or by any one acting as, an officer or employee of the United States Steel Corporation.

(10) Neither the president, secretary, treasurer, manager, or superintendent of defendant, nor any of its executive or managing operatives, is an officer of or employee of the United States Steel Corporation.

(11) Whenever any information concerning the affairs of defendant or any other action by defendant was desired by United States Steel Corporation, the United States Steel Corporation never obtained such information or took such action directly by its own officers or agents, but always made request for such information or action through the officers of defendant, in the way which is customary and usual between corporations which are separate and distinct corporations.

(12) Neither the money, accounts, or properties of defendant were commingled with the moneys, accounts, or properties of United States Steel Corporation, but the moneys, accounts, and properties of each company were kept separate and distinct from the moneys, accounts, and properties of the other and the identity, and integrity of the moneys, accounts, and properties of each company were preserved without any mixture, commingling, or confusion.

█ The government presents 21 facts or incidents which it argues indicate complete domination and control. It contends that the acquisition of the stock of the defendant and of the other subsidiaries mentioned in the bill was for the purpose of avoiding, among others, the commodities clause. That the ownership of such stock did not destroy the corporate entity is settled by the decisions heretofore discussed in this opinion. At the time the stock was acquired, and for many years prior thereto, the defendant operated a belt line railroad extending around Chicago. It connected many of the plants of the Steel Corporation subsidiaries, the Illinois Steel Company at South Chicago, Gary, and Joliet, the American Bridge Company, American Sheet & Tin Plate Company, and National Tube Company at Gary, American Steel & Wire Company at Joliet and Waukegan. Not only does it connect these plants with each other, but it connects them with all the trunk line railroads entering the city of Chicago. The acquisition of the stock of defendant grew out of an important business need. It served a legitimate economic purpose. The record is devoid of any evidence from which an inference could be drawn that the stock was acquired with the intent and purpose to avoid either the Anti-Trust Laws or the commodities clause.

It is also contended that the manner of electing directors and declaring dividends shows domination and control. Mr. Banks was president of defendant. For many years last past it has been customary, each year, for the Steel Corporation to issue its proxy to Mr. Banks. He exercised this proxy at annual meetings of the stockholders and annually boards of directors were elected in this manner. Not since 1920 have any officers of the Steel Corporation served as directors of defendant.

There were conferences between the defendant and the Steel Corporation relative to dividends and to disposition of other funds belonging to the defendant. But all these matters were matters pertaining to the internal affairs of the defendant. There can be no impropriety in a corporation consulting and advising with its stockholders as to dividends and as to other funds in which the stockholders have an interest. It must be noted that there was at no time any commingling of funds or properties.

█ For a number of years a consolidated income tax return has been filed for the Steel Corporation, the defendant, and other subsidiaries of the Steel Corporation. The filing of a consolidated income tax return did not destroy the separate corporate entities, but, on the contrary, maintained and preserved their integrity. Commissioner v. Van Camp Packing Co. (C. C. A.) 67 F.(2d) 596; Texas Pipe Line Co. v. U. S. (Ct. Cl.) 58 F.(2d) 852; Swift & Co. v.

U. S. (Ct. Cl.) 38 F.(2d) 365; Woolford Realty Co. v. Rose, 286 U. S. 319, 328, 52 S. Ct. 568, 78 L. Ed. 1128.

Defendant's general offices are located in the same building in Chicago, although on different floors. The employees in the office of the defendant company are not the employees of the other subsidiaries.

Mr. Knapp has been general counsel for the defendant since, and before, the organization of the Steel Corporation and is division counsel for certain subsidiaries, but not counsel for the Steel Corporation. For the past ten years defendant has paid its counsel directly. The employment of counsel was a matter of contract and convenience. No inference detrimental to the defendant can be drawn from the fact that its general counsel is also division counsel of other subsidiaries.

There was voluminous evidence pertaining to the relationship subsisting between the Steel Corporation and its subsidiaries. The Steel Corporation had many subsidiaries. It was not an operating company. It kept in close and intimate contact with its subsidiaries. It had periodical meetings of the presidents. It secured through reports from defendant and other subsidiaries and otherwise, information as to markets, the financial condition, the contracts and expenditures, budget estimates, and other matters pertaining to the subsidiary companies. Most of the evidence pertaining to the relationship between the steel companies and its subsidiaries related to matters concerning the internal affairs of the corporation. In most, if not all, of these relationships there was a scrupulous recognition of the separate entities. The most that can be said, when the evidence is analyzed and studied, is that the Steel Corporation as a stockholder has asked to be kept informed about the affairs of the defendant, has asked for an opportunity to tender advice and suggestions as to the conduct of internal affairs, and has maintained a lively interest in all that pertains to the defendant and the allied corporations.

But no single piece of evidence taken alone, nor all taken together and considered as a whole, warrant the inference that the defendant and the producing and manufacturing subsidiaries are under the domination, control, direction, and management of the Steel Corporation, in the sense that the defendant and the other subsidiaries are mere departments, branches, adjuncts, and instrumentalities of the Steel Corporation. The evidence fails to show that the defendant has any interest, direct or indirect, legal or equitable, in the articles or commodities which it transports for the subsidiaries of the Steel Corporation.

An order may be entered dismissing the bill for want of equity.