**BROOKS v. WILLCUTS, Collector of Internal Revenue.**
**No. 10178.**

Circuit Court of Appeals, Eighth Circuit.
June 12, 1935.

ceased. Being cast, an appeal was taken by appellant in conventional form.

Appellant's decedent, Dwight F. Brooks, died on January 21, 1930, the owner of 4,-992 shares of the capital stock of the Brooks-Scanlon Lumber Company. For the purpose of the assessment of the federal estate tax, these shares of stock, as of the date of deceased's death, were valued by appellee at $175 each. Upon this valuation appellee assessed and collected the alleged excess of estate tax here involved, and thereupon appellant brought this action in the District Court to recover back said sum as an overpayment.

The single question presented is whether the appellee collector was, upon the facts, in error in the method used by him in figuring the value of this stock, as of the death of decedent. The case was tried to the court, a jury being waived, which sustained the finding of the collector and rendered judgment for him.

The collector found, as already said, that these shares of stock were, as of the date of decedent's death, of the value of $175 each; while appellant contended, and here now contends, that the value of each share was only the sum of $140.

The value of this stock, as of January 21, 1930, and as a corollary, the legal method of ascertaining this value, is as forecast, the single question involved in this appeal and this question arose in the case upon facts which are few and fairly simple. The Brooks-Scanlon Lumber Company is a Delaware corporation, engaged at the date of decedent's death in the sawmilling and lumber business, at Foley, Fla. It owned and operated sawmills and lumber finishing plants and accessories. It also owned timberlands, cutover lands, and other real estate in Florida, and elsewhere. Its capital stock consisted of 38,270 shares, of the par value of $100 each, as of October 1, 1929, of which about 57 per cent. were owned by the Brooks and Scanlon families. In all, there were 77 shareholders residing in some twelve different states, nations, or provinces.

Edward S. Stringer, of St. Paul, Minn. (Thomas D. O'Brien and Alexander E. Horn, both of St. Paul, Minn., on the brief), for appellant.

E. H. Horton, Sp. Asst. to Atty. Gen. (Frank J. Wideman, Asst. Atty. Gen., Sewall Key and E. E. Angevine, Sp. Assts. to Atty. Gen., and George F. Sullivan, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for appellee.

Before GARDNER and FARIS, Circuit Judges.

FARIS, Circuit Judge.

Appellant sued the Collector of Internal Revenue for the District of Minnesota, for the refund of the sum of $26,208, alleged to have been illegally collected as a federal estate tax from appellant, as executor of the will of one Dwight F. Brooks, de-

The stock, so far as the record shows, had never been listed on any stock exchange, or actively dealt in by brokers, or others. There were shown by the evidence but five sales deemed by the court nisi to have been "within a reasonable period of the date of decedent's death." (See regulations, infra.) Three of these sales were made in September, 1929, one in October,

1929, and one in August, 1930. Altogether, 688 shares were so dealt in, at prices ranging from $102.50 to $150 per share, or an average price of $130.50.

Evidence was adduced on the trial below as to whether two of the sales of stock concededly made were had between willing sellers and willing buyers; as to the dividends annually paid, over a number of years; as to the value of accounts and bills receivable; as to the value of the physical properties of the company; and as to the book value of this stock as of December 31, 1929. This book value was $198.34. The reduction from the above book value to $175 per share is accounted for by the appellee's materially reducing the book value of accounts and notes receivable; the value of cutover lands and other assets shown by the books of the company, including stumpage.

Touching the five sales, the trial court found that, as to three of them, there was no evidence on the point whether they were had between "a willing buyer and a willing seller," and as to the two remaining sales, the court found specifically that the sellers had sold because of their financial exigencies, and so those two sales did not fall within the regulations of the Treasury Department, hereinafter set out.

Without taking up time and space to go fully into the statute on which the tax here is based, it is sufficient to say that the law then in force fixed a tax upon the value at the time of decedent's death of intangible assets, which includes shares of stock in corporations. (Section 302, Revenue Act of 1926, 44 Stat. 70, 26 USCA § 1094.) This statute does not, however, define the word "value," or prescribe how it shall be determined. This determination was left to be prescribed by regulations of the Treasury Department. (See article 13, Regulation 70, 1929). Section 1 of the regulations referred to above, so far as pertinent to this case, provided: "The value of all property includable in the gross estate is the fair market value thereof at the time of the decedent's death. The fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell."

Other provisions of these regulations provide thus: "Securities in which there are occasional transactions, but which are not dealt in actively enough to clearly establish a fair market value, should be valued upon the basis of the nearest sale to the date of death, provided such sale was made in the normal course of business between a willing buyer and a willing seller and within a reasonable period of the date of the decedent's death."

The provision last above is that on which appellant relies, and which he urges is alone applicable to the facts in the case at bar.

Still other provisions of these regulations, provide thus:

"Stock in a close corporation should be valued upon the basis of the company's net worth, earning and dividend-paying capacity, and all other factors having a bearing upon the value of the stock. Complete financial and other data on which the estate bases its valuation should be submitted in duplicate with the return.

"Where as to any particular security, conditions of sale or ownership are such that the fair market value, determined as already indicated, would not afford a proper basis for valuation, the Commissioner on final audit, will establish the value by considering all relevant factors. In any case where the estate contends that the value, if established by the general rules already given, is not the fair market value as of the date of death the evidence upon which it bases its contention should be filed with the return."

And the provisions last above are those on which the collector and the court nisi relied.

As forecast, the trial court found that there was no evidence as to the conditions under which three of the sales relied on by appellant were made, and as to the remaining two sales, that they were not made under such circumstances as to render both buyer and seller voluntary actors, within the purview of the regulations. In short, that in each of the two last sales the sellers were acting under the compulsion of pressing financial exigencies.

As to the first three sales above referred to, the burden was on appellant to bring himself within that provision of the quoted regulations, which enables him to rely upon a sale when that sale is "made in the normal course of business between a willing buyer and a willing seller, * * * neither being under any compulsion to buy or sell." See section 1 and section 3, Regulations, supra. This, as said by the trial court, he did not do; though

the burden of proof was on him. Robertson v. Routzahn (C. C. A.) 75 F.(2d) 537; Commissioner v. Robertson (C. C. A.) 75 F.(2d) 540; United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; Botany Worsted Mills v. United States, 278 U. S. 282, 49 S. Ct. 129, 73 L. Ed. 379; Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184.

█ It must be borne in mind, that the trial here was before the court, a jury having been more than formally waived, since it was made in writing, now no longer required. In such a case, ever since the case of Dooley v. Pease, 180 U. S. 126, 131, 21 S. Ct. 329, 331, 45 L. Ed. 457, local citation (and even before), it has been a rule of appellate review that the findings of fact by the court in a jury-waived law case are, when based on substantial evidence, conclusive. In the case of Dooley v. Pease, supra, the Supreme Court said:

"Where a case is tried by the court, a jury having been waived, its findings upon questions of fact are conclusive in the courts of review, it matters not how convincing the argument that upon the evidence the findings should have been different. Stanley v. Supervisors, 121 U. S. [535], 547, 7 S. Ct. 1234, 30 L. Ed. [1000], 1002.

"Errors alleged in the findings of the court are not subject to revision by the circuit court of appeals or by this court, if there was any evidence upon which such findings could be made. Hathaway v. First National Bank, 134 U. S. [494], 498, 10 S. Ct. 608, 33 L. Ed. [1004], 1006; St. Louis v. Rutz, 138 U. S. [226], 241, 11 S. Ct. 337, 34 L. Ed. [941], 946; Runkle v. Burnham, 153 U. S. [216], 225, 14 S. Ct. 837, 38 L. Ed. [694], 697."

See, also, United States v. Worley (C. C. A. 8) 42 F.(2d) 197, 199; Majestic Co. v. Orpheum Circuit (C. C. A. 8) 21 F.(2d) 720, 731; Simmons v. Utah Copper Co. (C. C. A. 8) 15 F.(2d) 780, 782.

█ A finding of fact contrary to the weight of the evidence is an error of fact which cannot be reviewed. Wear v. Imperial Window Glass Co. (C. C. A. 8) 224 F. 60, 63; Allen v. Cartan & Jeffrey Co. (C. C. A. 8) 7 F.(2d) 21, 22; Denver Live Stock Commission Co. v. Lee (C. C. A. 8) 18 F.(2d) 11; Federal Intermediate Credit Bank v. L'Herisson (C. C. A. 8) 33 F.(2d) 841, 843."

█ Much is said here in the briefs of counsel for and against the view that the Brooks-Scanlon Lumber Company was a "close corporation" within the purview of that part of section 3 of the regulations above quoted, and on which appellee relies. We are of opinion that the term "close corporation," as used in the regulation, was not used in the sense in which the term is used in the law of England, where it means a corporation which fills its own vacancies, or in which the power of voting is held perforce manipulation under fixed and well-nigh perpetual proxies. McKim v. Odom, 3 Bland [Md.] 407. It seems rather plain that the regulations used the term in no technical sense, but in accord with the popular, or vernacular, understanding. This understanding is strongly indicated, or illustrated by broad inference, in an expression by Mr. Chief Justice Hughes, in the late case of The Thomas Barlum, 293 U. S. 21, 55 S. Ct. 31, 32, 79 L. Ed. 176, where it is said that: "the mortgagor [a corporation], at the time the mortgages were executed, was a close corporation, about four-fifths of its shares being owned by John J. Barlum."

In other words, a "close corporation" means, in the vernacular, a corporation in which the stock is held in few hands, or in few families, and wherein it is not at all, or only rarely, dealt in by buying or selling. It seems fairly plain that the regulation would subserve no practical purpose if it should be held that the term "close corporation" is used therein in its technical, legal sense. But when it is considered that the Treasury Department by the use of the term was seeking a way to fix the value of stocks which were not listed on the stock exchanges, and in which there had not been within a reasonable period near decedent's death any dealings, it was driven ex necessitate to use a term from the common understanding to designate generally a class to which other regulations did not apply. We are not able to see much relevancy in the contentions here made pro and con the definition. It seems fairly obvious that instead of using the term "close corporation," the situation intended to be covered could have been as well covered if the regulation had omitted the use of the term, and said: "Shares of corporate stock, not listed on any stock exchange, not dealt in actively by brokers, not quoted on a bid and asked price, not sold by the personal representative of de-

cedent, or at private sale, within a reasonable period near decedent's death, shall be valued upon the basis of the company's net worth etc." For this seemingly was what was meant. The trouble arose, it would seem, in an effort to shorten the language of the regulation, by the somewhat unfortunate use of a term having both a popular and a technical meaning; the latter affording no practical aid when applied toward a solution of the situation confronting the Treasury Department. In short, clarity was sacrificed for brevity.

Since the burden was on appellant to show sales without compulsion and within a reasonable time of decedent's death, between a willing buyer and a willing seller; since the evidence was for the court sitting as a jury, and since there is substantial evidence to sustain the court's finding, we are of the opinion that the case should be affirmed, and so we order.