**E. ALBRECHT & SON, Inc., v. LANDY,
Collector of Internal Revenue.**

No. 2953.

District Court, D. Minnesota, Third
Division.

April 19, 1939.

Oppenheimer, D i c k s o n, Hodgson, Brown & Donnelly, of St. Paul, Minn., for plaintiff.

Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., for defendant.

SULLIVAN, District Judge.

This suit is brought to recover payments of excise taxes alleged to have been erroneously exacted under Section 604 of the Revenue Act of 1932, 26 U.S.C.A. end of c. 20.

The plaintiff and its predecessors in interest, for approximately seventy-seven years prior to June 20, 1932, were engaged in manufacturing and selling articles made of fur. Plaintiff's sales during said period of time were divided into the following branches:

(a) As a manufacturer;

(b) At wholesale;

(c) At retail;

(aa) Through retail stores in St. Paul and Minneapolis, Minnesota;

(bb) Through mail orders solicited by advertising.

In anticipation of the passage of an excise tax act for the year 1932 upon articles made of fur, the officers, directors and stockholders of the plaintiff company (hereinafter referred to as the manufacturing company), on June 16, 1932, caused to be organized under the laws of the State of Minnesota, the E. Albrecht & Son Company (hereinafter referred to as the sales company), its purpose being generally the sale at wholesale and retail of fur garments and articles. On June 20, 1932, but as of February 1, 1932 (that being the commencement of the fiscal year for the manufacturing company), the manufacturing company sold, assigned and set over to the sales company its retail stores and business, and its (1) merchandise inventory of finished articles; (2) articles of wearing apparel in the process of manufacture, and as to which all necessary furs had been definitely and specifically allocated; (3) all repair items, so-called, finished or in the process of completion, and as to which all necessary furs had been definitely and specifically allo-

cated; (4) all of its wholesale and retail business; (5) all accounts and bills receivable, and any security given therefor, and accounts receivable on account of all wholesale or retail sales, furs, storage, repairs; (6) the right to use the firm name, "E. Albrecht & Son" in the wholesale and retail fur and allied business. The sale price was the inventory value of stock and materials, and was paid by the issuance and delivery of all of the shares of the stock of the sales company to the manufacturing company, and nothing more. The officers of the sales company are identical with those of the manufacturing company, as are its stockholders. Each company, however, keeps and maintains its own books and records, and although the manufacturing company and the sales company occupy the same building in St. Paul, space, rental and maintenance expense thereof are allocated between the two companies. The executive officers of the companies are the same, and many of the employees are in the service of both companies, but the salaries of the officers and employees are allocated to the respective companies.

The fur industry (aside from the growing or trapping of furs, or the sale of raw furs, or the tanning thereof) normally divides itself into three classifications:

(1) The manufacture of articles of wearing apparel and the like, the same being sold at a manufacturer's price to the wholesaler, or jobber;

(2) The wholesaler, or jobber, who sells at a wholesale price to the retailer;

(3) The retailer, who sells at a retailer's price to the ultimate customer.

However, some manufacturers may sell some articles to wholesalers at the manufacturer's price, some of the same articles to retailers at wholesaler's prices, and some of the same articles to the ultimate customer at the retailer's price. Previous to the organization of the sales company, the plaintiff conducted all of the above branches of the fur business, save and except that it did not sell at a manufacturer's price to any wholesaler, but each division of its business was carried on separately.

From and after June 20th, 1932, the manufacturing company sold all of its manufactured products to the sales company at what is contended by the plaintiff to be a manufacturer's price, and, in any event, at prices lower than those at which said articles were sold in the ordinary course of trade by manufacturers or producers thereof. The manufacturing company does not sell to persons other than the sales company; that is, the entire product of the manufacturing company is sold to the sales company, to the exclusion of other business which it might obtain ordinarily as a manufacturer selling on the market generally at manufacturers' prices.

During the year 1932, the retail business of the so-called sales company was approximately $170,000, and that of the wholesale branch of the business was approximately $77,000. Neither the plaintiff nor the sales company paid any customers' excise tax on the completed garments, or garments in process of manufacture, which were transferred by the manufacturing company to the sales company on June 20, 1932. The Commissioner of Internal Revenue determined that this transfer was not a bona fide sale of such garments, and assessed taxes on the same on the basis of the wholesale selling price thereof. On the completed garments, the assessment was $4,228.57, and on articles in process of manufacture, the sum of $1,165.32. However, the Commissioner, in instances where the sales company was required to sell garments at a price less than wholesale, assessed the tax on the basis of twenty per centum less than the selling price.

On articles sold by the manufacturing company to the sales company subsequent to June 21, 1932, the plaintiff paid a tax on a selling price basis of cost plus thirteen per centum. The Commissioner of Internal Revenue determined that this was not the proper basis for the tax, since it was not a bona fide sale and not an "arms-length transaction", and that it was not the price for which such articles were sold in the ordinary course of trade by manufacturers or producers thereof. He determined that the proper basis for such tax was the wholesale selling price of such article, and in the event that an article was sold at sacrifice and at less than the wholesale price, then on a selling price basis of twenty per centum less than the actual selling price, and accordingly assessed additional taxes in the sum of $1,386.29.

There was a further assessment against the plaintiff company of $602.87, covering tax on repair items, the necessary materials for such repair items having been transferred to the sales company on June

20, 1932. Upon these items no tax had been paid, and the Commissioner determined that a tax was due and assessed that amount on such items, using as a basis the price paid for the repair job upon the ground that the labor and new fur going into the repair were not billed to the customer as separate items.

Subsequent to June 21, 1932, the Commissioner assessed additional taxes above what the plaintiff had paid, in the sum of $2,278.74, of which $892.45 represents tax on repair items arising after June 21, 1932, in addition to that which the plaintiff had paid in its returns, and such additional tax was due to the fact that the Commissioner used as a basis therefor the price made on the repair job by the sales company to its customers, rather than on the cost of the new fur going into the repair items. On repair items, the Commissioner of Internal Revenue assessed the tax only on such items in which new fur constituted the component material of chief value. The invoice to the customer did not disclose the cost or price of the new fur going into the repair job. However, the books and records of the sales company disclosed such fact, and allocated the different costs going into the repair job.

On January 14, 1936, plaintiff paid said taxes so assessed in the sum of $8,275.50, plus interest, making a total of $11,055.20, and on January 17, 1936, plaintiff duly filed with the defendant as Collector of Internal Revenue of the United States in and for the District of Minnesota, and with the Commissioner of Internal Revenue, its claim for refund of the taxes so paid, and on October 30, 1936, the Commissioner disallowed and denied said claim for refund.

Under Section 604, Revenue Act of 1932, 26 U.S.C.A. end of c. 20, there is "imposed upon the following articles, sold by the manufacturer, producer, or importer, a tax equivalent to 10 per centum of the price for which so sold: Articles made of fur on the hide or pelt or of which any such fur is the component material of chief value."

Section 619(b) of the Revenue Act of 1932, 26 U.S.C.A. end of c. 20, reads as follows:

"(b) If an article is—

"(1) sold at retail;

"(2) sold on consignment; or

"(3) sold (otherwise than through an arm's-length transaction) at less than the fair market price; the tax under this title shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner."

Regulation 46, Article 15, promulgated under the authority of the Revenue Act of 1932 by the Commissioner of Internal Revenue, reads in part as follows:

"The 'fair market price' within the meaning of the Act and these regulations is the price for which articles are sold by manufacturers at the place of manufacture or production in the ordinary course of trade and in the absence of special arrangements. Where, for any reason, a manufacturer's sale price does not properly reflect the price for which similar articles are sold at the place of manufacture or production in the ordinary course of trade by manufacturers and the sale is not an arm's-length transaction, the tax shall be computed upon a fair market price.

\* \* \* \* \* \*

"Where a manufacturer sells articles at retail, the tax on his retail sales ordinarily will be computed upon a price for which similar articles are sold by him at wholesale. However, in such cases it must be shown that the manufacturer has an established bona fide practice of selling the same articles in substantial quantities at wholesale. If he has no such sales at wholesale, a fair market price will be determined by the Commissioner."

### Corporate Entity.

At the outset the question arises: Are the two companies separate legal entities, or are they for all practical purposes merged, the sales company being a part of the manufacturing company and acting as its agent or instrumentality in the sale of its products?

The plaintiff contends that the manufacturing company and the sales company are separate and distinct entities, and the defendant contends to the contrary.

The doctrine of legal entity of corporations for tax purposes, as well as other purposes, has been applied and withheld by the courts. It appears to be the general rule that the doctrine of corporate entity should be ignored with caution, and only when circumstances clearly justify it, but it has been frequently stated that it should be disregarded if its application would work an injustice or give an unfair

advantage. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Commerce Trust Company et al. v. Woodbury et al., 8 Cir., 77 F.2d 478, 487.

There was no legal objection to the organization of the sales company by the plaintiff for the purpose of attempting to lessen the taxes against it. The law is settled that a taxpayer may use any lawful means to avoid payment of a tax. United States v. Isham, 17 Wall. 496, 84 U.S. 496, 21 L.Ed. 728. A corporation and its stockholders are treated as separate entities. Cannon Manufacturing Co. v. Cudahy Packing Company, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Burnet v. Commonwealth Improvement Company, 287 U.S. 415, 53 S.Ct. 198, 77 L.Ed. 399. Corporations are regarded as separate entities, even though their stockholders are the same, but when it appears that a corporation is owned and controlled by another in such a manner as to make it merely an instrumentality or adjunct of the other corporation, the theory of separate identity will not be recognized. Chicago, Milwaukee & St. Paul Railway Company, et al. v. Minneapolis Civic & Commerce Association, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229.

A wholly-owned subsidiary corporation may be a corporate entity, but, at the same time, it may be a mere instrumentality of the parent corporation to carry out its purpose and business. This question has been considered many times by the courts.

In Southern Pacific Company v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 543, 62 L.Ed. 1142, the court, in considering the doctrine of separate legal entity, stated: "While the two companies were separate legal entities, yet in fact, and for all practical purposes they were merged, the former being but a part of the latter, acting merely as its agent and subject in all things to its proper direction and control. * * * The case turns upon its very peculiar facts * * *".

In considering an attempted reorganization in Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355, the court said: "Putting aside, then, the question of motive in respect of taxation altogether, and fixing the character of the proceeding by what actually occurred, what do we find? Simply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real char-

acter, and the sole object and accomplishment of which was the consummation of a preconceived plan, not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner. No doubt, a new and valid corporation was created. But that corporation was nothing more than a contrivance to the end last described."

Then, in Chicago, Milwaukee & St. Paul Railway Company, et al. v. Minneapolis Civic & Commerce Association, supra, 247 U.S. on pages 500, 501, 38 S.Ct. on page 557, 62 L.Ed. 1229, the court said:

"Much emphasis is laid upon statements made in various decisions of this court that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two. * * *

"While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. United States v. Lehigh Valley R. Co., 220 U.S. 257, 273, 31 S.Ct. 387, 55 L.Ed. 458; United States v. Delaware, Lackawanna & Western R. Co., 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438. In such a case the courts will not permit themselves to be blinded or deceived by mere forms of [or] law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

In Centmont Corporation v. Marsch, 1 Cir., 68 F.2d 460, at page 464, we find this statement:

"The rule is frequently stated in the following terms:

"'(1) The legal fiction of distinct corporate existence will be disregarded, when necessary to circumvent fraud. (2) It may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make

it merely an instrumentality or adjunct of another corporation.' In re Watertown Paper Co. (C.C.A.) 169 F. 252, 256."

In Phelps v. Commissioner of Internal Revenue, 7 Cir., 54 F.2d 289, on page 291, the court stated: "But in all relations of life it oftentimes happens that the thing done speaks so audibly that equity is prevented from hearing the language of the parties, and will classify the act by its real name rather than by the name which the interested parties have given it. In such instances the substance of the transaction will control the form, and the Board therefore was warranted in considering both form and substance in arriving at its conclusion. United States v. Phellis, 257 U.S. 156, 42 S.Ct. 63, 66 L.Ed. 180; United States v. Klausner (C.C.A.) 25 F.2d 608."

The Eighth Circuit Court of Appeals, in considering the doctrine of separate corporate entity, in the case of Commerce Trust Company et al. v. Woodbury, et al., supra, stated that while a corporation is generally a wholly separate entity from the stockholders, and ownership of all stock of one corporation by another, and identity of officers, will not alone create a merger or make one principal or agent of the other, the courts will ignore the fiction of corporate entity only when used as a subterfuge to defeat public convenience, justify wrong, or perpetrate fraud. The court further stated [77 F.2d 487]: "But, notwithstanding this, we are constrained by the uncontradicted facts to the conclusion that the sales company was, as it was controlled, and as it functioned, merely an agency or department of the lumber company."

In Minnesota Tea Company v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474, the Supreme Court of the United States reaffirmed the principle stated in Gregory v. Helvering, supra.

In Morsman v. Commissioner of Internal Revenue, 8 Cir., 90 F.2d 18, at page 22, 113 A.L.R. 441, the court said: "When a taxpayer thus boldly proclaims that his intent, at least in part, in attempting to create a trust is to evade taxes, the court should examine the forms used by him for the accomplishment of his purpose with particular care; and, if his ingenuity fails at any point, the court should not lend him its aid by resolving doubts in his favor."

The Supreme Court, in Gulf Oil Corporation v. Lewellyn, 248 U.S. 71, 39 S.Ct. 35, 63 L.Ed. 133, in considering the question, made this statement: "It is true that the petitioner and its subsidiaries were distinct beings in contemplation of law, but the facts that they were related as parts of one enterprise, all owned by the petitioner, that the debts were all enterprise debts due to members, and that the dividends represented earnings that had been made in former years and that practically had been converted into capital, unite to convince us that the transaction should be regarded as bookkeeping rather than as 'dividends declared and paid in the ordinary course by a corporation.'"

■ Whether the separate entity theory of corporations should be recognized and observed, or should be disregarded, is dependent upon the facts and circumstances in the particular case under consideration. Southern Pacific Company v. Lowe, supra; Helvering v. Gordon, 8 Cir., 87 F.2d 663.

Were the acts of the taxpayer, in organizing the sales company and transferring to that company articles completely manufactured, or in the process of manufacture, prior to the effective date of the taxing act, sufficient to relieve such articles from the tax?

■ Section 604 of the Revenue Act was designed to tax the sale of the manufactured articles upon a basis of the actual selling price of the same by the manufacturer. It was stated in Metropolitan Holding Company, Inc., et al. v. Snyder, 8 Cir., 79 F.2d 263, 103 A.L.R. 912, that the objects of the statute are not to be defeated by mere forms of transactions. In determining the question of the separate corporate entity of the two companies, the Court must consider all the facts and circumstances surrounding the sale of June 20, 1932, the purpose of the organization of the sales company and the bona fides of the sale, together with all other circumstances which shed any light upon the question of whether or not the sales company was intended to be used as an agency of the manufacturing company. The surrounding facts and circumstances in this case speak with clarity and force. The purported sales of articles in the process of manufacture were not bona fide transactions, and no title to those articles passed, since the same upon the date of the bill of sale were not in a deliverable state. See Sections 8393, 8394, Mason's Minnesota Statutes, 1927. Here we have a manufacturing company dealing with a sales company, a wholly-owned subsidiary,

with no assets save those it received from the plaintiff. The sale price was the inventory value of the stock and materials. The trade name, E. Albrecht & Son, no doubt of material value, was apparently not considered in determining the amount of the sale price. Value of good will apparently was given no consideration, although this business had been carried on in St. Paul for a period of approximately seventy-seven years.

During the year 1932 the business of the sales company was approximately $170,000 in the retail department and $77,-000 in the wholesale department. The sales company was organized and is owned by the plaintiff. Both companies have the same officers, and the policy and prices of the sales company are controlled by the plaintiff. The manufacturing company sells exclusively to the sales company. It does not offer its products for sale upon the market generally. The sales company did nothing which theretofore had not been done by the manufacturing company. In form it only divided its business into a manufacturing department, which it retained, and a sales department (wholesale and retail), which it transferred to the sales company, but over which it retained absolute control. It might be observed that before the organization of the sales company, these three departments were recognized in the business of the manufacturing company.

It is the Court's opinion from all of the facts and circumstances herein that while the plaintiff attempted to make the transaction of June 20, 1932, valid, its efforts did not constitute or lay the foundation for a bona fide sale, and that the sales company, being a wholly-owned subsidiary company, was utilized by the plaintiff as a mere instrumentality for the purpose of avoiding an imminent tax. The circumstances will permit no other conclusion in the matter.

### Basic Selling Price.

The next question presented is, what selling price should be adopted as a basis in computing the tax?

The plaintiff's contention that the sales of the completed articles, and articles in process of manufacture, by the manufacturing company to the sales company, evidenced by the bill of sale bearing date, June 20, 1932, is not well taken, and, of course, those articles upon sale were subject to tax on the same basis as were the articles sold by the plaintiff to the sales company subsequent to June 20, 1932. The plaintiff's contention as to the subsequent sales is that the price basis adopted for the purpose of fixing the tax should be the selling price made by it to the sales company, that such sales between the two companies were made at a fair market price and therefore Section 619(b) (3) has no application, and that the Commissioner erred in adopting as a basis for taxes the wholesale price at which such articles were sold by the sales company.

The government, on the other hand, contends that the alleged sales by the plaintiff to the sales company were, first, not bona fide transactions, and, next, were not "arm's-length transactions", and were at less than the "fair market price", and that the Commissioner properly determined the price at which such articles were sold in the ordinary course of trade, and that the tax was properly computed on the basis of the wholesale price.

The plaintiff's price to the sales company was the actual cost of the article, plus thirteen per centum of the cost, and plus the excise tax of ten per centum of the selling price. This is the price the plaintiff contends should be adopted as a basis for tax purposes on all sales between the two companies subsequent to June 21, 1932.

If sales by a manufacturing company to a distributing subsidiary are at a fair market price, or if the same are at "arm's length", the tax is assessed under Section 604 of the Revenue Act of 1932, at ten per centum of the sales price. But on the other hand, if the sales are not at "arm's-length", or are at less than the fair market price, Section 619(b) (3), and Regulation 46, Article 15, apply.

In the instant case, at the beginning of each trade year the manufacturing company made estimates of all materials, labor and costs going into the manufacture of the different items or models of fur articles to be manufactured by it during that year, and built up what is termed in the trade, a "scale book", which reflected the estimated cost of the different items or models.

As characteristic of the dealings between the two companies, it appears that the price quoted by the sales company to a wholesale customer was the estimated cost, as noted in the "scale book", plus tax, plus a fifty per centum mark up. However, the price made to the sales com-

pany by the plaintiff was the actual cost of the article, plus a thirteen per centum mark up, plus the tax. The estimated cost of the article, as shown by the "scale book", was in all instances greater than the actual cost of the item, plus the thirteen per centum mark up, plus the tax.

The first offer of any article, upon its manufacture, to the public was made by the sales company. The manufacturing company at no time offered any of its products to the public. There is no manner or way by which the market value of the articles manufactured by the plaintiff can be determined, save and · except upon sales of such articles to persons desirous of purchasing the same. Market value is frequently stated to be such price as dealers in goods are willing to receive and the purchasers are made to pay when the goods are bought and sold in the ordinary course of trade. Muser v. Magone, 155 U.S. 240, 249, 15 S.Ct. 77, 39 L.Ed. 135; Sagamore Iron Co. v. Ash Iron Co., 8 Cir., 24 F.2d 692, 694. To ascertain fair market value, the sales must be free and open. It cannot be obtained from restricted sales, such as we have in this case by the manufacturing company to the sales company. ·

The Commissioner determined the fair market value of plaintiff's products to be the wholesale price which was asked and received by the sales company. The burden of proving that the assessment of the Commissioner is incorrect rests upon the plaintiff. United States v. Anderson et al., 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347.

Plaintiff contends that sales made by it to the sales company were not only at fair market prices, but were at prices at which said articles were sold in the ordinary course of trade, by the manufacturers thereof, but there is no evidence of any probative value to support this contention.

An interesting case in which many of the questions raised herein were considered is that of Bourjois, Inc., v. McGowan, D.C., 12 F.Supp. 787, 790, affirmed Second Circuit Court of Appeals, 85 F.2d 510, certiorari denied, 300 U.S. 682, 57 S. Ct. 753, 81 L.Ed. 885, wherein it was stated that sales between a manufacturing company and a sales company, which latter company was owned by such ·manufacturing company, are not ipso facto, "not at arm's length". Whether they are, raises a question of fact and the court, going on with a review of the facts, which are very

similar to those in the case at bar, stated: "It seems to me that the presumption that these transactions were not at arm's length has not been met or overcome. In law it resulted in nothing more than carrying on the old business by a changed method." To the same effect is the case of Inecto, Inc., v. Higgins, D.C. So. Dist. N.Y., 21 F.Supp. 418. See also Concentrate Manufacturing Corporation v. Higgins, 2 Cir., 90 F.2d 439; Continental Oil Company v. H. C. Jones, Collector, D.C., 26 F.Supp. 694, decided by the United States District Court for the Western District of Oklahoma on February 16, 1939. The holding· in Pickwick Corporation v. Welch, D.C. So. Dist. Cal., 21 F.Supp. 664, is not in conflict with the cases hereinbefore cited, but is in harmony with such decisions. The taxpayer therein contended that since the articles were sold by the parent corporation to a wholly-owned subsidiary, the subsidiary was its alter ego; that there was no valid sale, and accordingly no tax (excise tax) should attach, but the court in determining the question as to whether the transactions between the parent and subsidiary corporations were subject to a tax, found that the sales between the two companies were bona fide, at a fair market price, and consequently were taxable, the distinction again being whether or not the transactions between the parent and subsidiary corporations were bona fide.

The Commissioner followed Article 15, Regulation 46 (quoted hereinbefore) in assessing the tax, and used as a basic sale price in determining the tax the wholesale price at which the articles were sold, with the exception that when articles were sold at a sacrifice, and at less than wholesale, he used a basic price of twenty per centum less than the selling price of the article. This was the Commissioner's "determination", and unless the same is arbitrary or capricious, it should be upheld. Ray Consolidated Copper Company v. United States, 268 U.S. 373, 45 S.Ct. 526, 69 L.Ed. 1003. Even though it were only prima facie correct, it would not be disturbed unless overcome by substantial evidence. Brooks v. Willcuts, 8 Cir., 78 F.2d 270; Tunnel Railroad of St. Louis v. Commissioner, 8 Cir., 61 F.2d 166. But in this case there is substantial evidence supporting the "determination", and no evidence of any probative value to the contrary. The sales company acted as a conduit for the manufacturing company in getting articles to bona fide buyers.

The proper basic price upon which the tax should be computed is the wholesale price at which the sales company sold the articles, and in instances where the articles were sold at sacrifice, and at less than the wholesale price, the basic price of twenty per centum less than what said articles were ordinarily sold at.

### Items Covered by Chattel Mortgages.

 The question is raised as to whether the tax is applicable to (a) completed articles on hand June 21, 1932, but previously sold to wholesale dealers other than the sales company, and to customers at retail, there having been, however, no delivery to the purchasers until after the effective date of the taxing act, and (b) to partially completed garments, together with all furs necessary to complete the same, delivery of which was not made to the customer until after the effective date of the taxing act.

As to the articles described in subdivision (a) just above, bills of sale were given to the purchasers, who in turn executed and delivered to the sales company a note and chattel mortgage evidencing the unpaid balance of the purchase price, all this being done before the effective date of the tax. The plaintiff contends that these were unconditional sales, while the defendant contends that the same were not bona fide sales, and accordingly are subject to the tax. If the sales are bona fide and unconditional, the same are not subject to tax. There is no question in the Court's mind as to the bona fides of these sales. The articles were sold in the usual course of trade, and at prices usually received for such articles. There is no question but that they were absolute sales without any condition whatsoever, and that the property passed to the purchaser.

Article 5, Regulation 46, provides that in general the tax attaches when the title to the article sold passes from the manufacturer to the purchaser, and states that the intention of the parties as to when title passes is dependent upon the contract of sale and the attendant circumstances, and in the absence of expressed intention, the legal rules of presumption followed in the jurisdiction where the sale is made govern in determining when title passes. The rules for ascertaining the intention of the parties as to when the title passes from the seller to the buyer insofar as the same are material herein are set out in the case of Day et al. v. Gravel, 72 Minn. 159, 75 N.

W. 1, 2: "Where there is an unconditional contract for the sale of specific goods, in a deliverable state, the property, unless a different intention appears, passes to the buyer when the contract is made, and it is immaterial whether the time of payment or the time of delivery, or both, be postponed. Where there is a contract for the sale of specific goods, and the seller is bound to do something to the goods for the purpose of putting them into a deliverable state, the property does not pass until such thing be done." This rule of law has been given force and effect by statutory enactment. See Sections 8393 and 8394, Mason's Minnesota Statutes, 1927. The title in the property is presumed to pass when the contract is made, if the goods are properly identified and nothing further remains, other than delivery of the goods and the payment of the price. Jock v. O'Malley, 138 Minn. 388, 165 N.W. 233; E. L. Welch Company v. Lahart Elevator Company, 122 Minn. 432, 142 N.W. 828; Louis F. Dow Company v. Bittner et al., 187 Minn. 143, 244 N.W. 556.

From the evidence it appears that it was the intention of the parties that title to such items as were fully manufactured, pass to the customer on the date of the execution and delivery of the bill of sale, and such items are not subject to the tax. With reference to the articles that were not fully manufactured, the tax does apply, since the seller was bound to do something to put such articles in a deliverable state, and the title, under the Minnesota decisions and the statutory enactment, is declared not to have passed.

### Repair Items.

$602.87 of the tax involved represents a tax imposed on repair items completed, and in process of completion, on June 20, 1932, which items, and the necessary materials to complete such repair jobs as were not completed on that date, were transferred to the sales company, and comprise items of tax based upon the entire cost of the different repair jobs.

$892.45 represents additional tax on repair items received and made by the plaintiff subsequent to June 21, 1932, which additional tax was based on the difference between the selling price of the new fur used in such repair items, and the entire price of the repair job.

 The invoice furnished to the customer on a repair job did not disclose a

breakdown of the items going into the repair, but the records of the manufacturing company and the sales company show the cost of the fur, labor and material separately, and are in compliance with Regulation 46, Article 25, which reads as follows:

"Art. 25. Repairs.—Ordinary repairs to an article made wholly or in part of fur on the hide or pelt are not taxable, but where new fur is supplied the tax attaches to the sale of such new fur. The price paid for the repair job will be presumed to be the price for which such fur is sold unless the labor and new fur are billed as separate items. Where the price attributable to the new fur is shown as a separate item on the invoice furnished to the customer, *or if the price of the new fur* used can be established to the satisfaction of the Commissioner by adequate records, the tax will attach to the sale price of the new fur only. New fur furnished in repair jobs completed or delivered *during the period June 21, 1932 to May 10, 1934, (both dates inclusive) and on or after June 23, 1936*, is subject to tax regardless of the price charged for such fur. No tax will attach to new fur furnished in repair jobs completed and *delivered during the period* May 11, 1934, *to June 22, 1936, (both dates inclusive)* where the price charged for such fur is less than $75." (Italics supplied).

That portion of the Regulation which is italicized was incorporated therein on July 22, 1936, same not having been theretofore a part of such Regulation. The amended Regulation applies. Manhattan General Equipment Company v. Commissioner of Internal Revenue, 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528.

In the instances where the manufacturing company had certain repair jobs on hand which it transferred as of June 20, 1932, with all necessary furs and materials to the sales company, and agreed to complete these repair jobs, and did complete them, subsequent to the effective date of the tax, the tax applies, as it does to repair jobs which were completed before the effective date of the tax, but no delivery of the garment, or invoice or statement of the same, having been prepared or rendered the customer.

The tax is effective only when new fur is supplied, and when such new fur is "the component material of chief value" in the repair job, and should in this case attach to the sale price of such new fur only, and not to the price charged for the entire repair job.