DANZIGER ET AL., APPELLANTS, *v.* LUSE, APPELLEE.

[Cite as *Danziger v. Luse,* 103 Ohio St.3d 337, 2004-Ohio-5227.]

(No. 2002–1880—Submitted October 7, 2003—Decided October 13, 2004.)

PFEIFER, J.

{¶ 1} The issue in this case is whether appellants have a right to inspect the records of a wholly owned subsidiary of the company in which they own stock. For the reasons that follow, we conclude that they do.

{¶ 2} Appellants Jared, Nathan, and Samuel Danziger own stock in Croghan Bancshares, Inc. ("the company"), which has one operating asset, Croghan Colonial Bank ("the bank"). The bank has only one stockholder, the company. In February 2001, the Danzigers sent a letter to the company demanding to review the corporate minutes of the company and the bank. When the company failed to respond, the Danzigers filed a complaint in common pleas court, asserting that they had a right as shareholders of the company to inspect the corporate minutes of both the company and the bank.

{¶ 3} After receiving the complaint, the company informed the Danzigers that it would permit them to examine its corporate minutes. The company also informed the Danzigers that it would not permit them to examine the bank's corporate minutes because the Danzigers were not shareholders of the bank. The Danzigers advised the company that they did not distinguish between the

company and the bank because "[t]he Officers are the same, the Directors are the same, the ownership is the same and the sole source of income and performance measurement of the holding company is the sole subsidiary."

{¶ 4} The Danzigers filed exhibits with the trial court demonstrating that the company and the bank have the same directors and the same officers, that the company owns all of the bank's stock, and that the company's sole source of income is dividends paid by the bank. Both parties moved for summary judgment. The trial court granted the company's motion for summary judgment, finding that the company had complied with R.C. 1701.37(C) by offering the Danzigers an opportunity to inspect and copy its minutes. The court also found that the Danzigers did not have a right to examine the minutes of the bank pursuant to R.C. 1103.16(C) because they were not shareholders of the bank. The court of appeals affirmed the trial court's judgment.

{¶ 5} The cause is now before this court upon our acceptance of a discretionary appeal.

{¶ 6} At common law, the right of a shareholder to inspect the books and records of a corporation was a fundamental "incident to ownership of stock." *Cincinnati Volksblatt Co. v. Hoffmeister* (1900), 62 Ohio St. 189, 199, 56 N.E. 1033. This court stated that the right to inspection rests "upon the broad ground that the business of the corporation is not the business of the officers exclusively, but is the business of the stockholders." Id. See *William Coale Dev. Co. v. Kennedy* (1930), 121 Ohio St. 582, 170 N.E. 434. A shareholder's right to inspect is codified in R.C. 1701.37(C), which states:

{¶ 7} "Any shareholder of the corporation, upon written demand stating the specific purpose thereof, shall have the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the articles of the corporation, its regulations, its books and records of account, minutes, and records of shareholders * * *."

{¶ 8} The right of shareholders of banks to inspect a bank's records is set forth separately in R.C. 1103.16(C), which provides:

{¶ 9} "Any shareholder of the bank, upon written demand stating the specific purpose of the demand, has the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the books and records of the bank, except books and records of deposit, agency or fiduciary accounts, loan records, and other records relating to customer services or transactions."

{¶ 10} R.C. 1701.37(C) and 1103.16(C) do not address whether shareholders have a right to inspect the records of a wholly owned subsidiary of the company in which they own stock. R.C. 1701.37(C) and 1103.16(C) provide inspection

rights only to shareholders. Because the Danzigers do not own stock in the bank, we conclude that they do not have a statutory right to inspect the records of the bank.

{¶ 11} That conclusion is not dispositive, because the Danzigers also assert a common-law right to inspect. In Ohio, "[n]ot every statute is to be read as an abrogation of the common law. 'Statutes are to be read and construed in the light of and with reference to the rules and principles of the common law in force at the time of their enactment, and in giving construction to a statute the legislature will not be presumed or held, to have intended a repeal of the settled rules of the common law *unless the language employed by it clearly expresses or imports such intention.*'" (Emphasis sic.) *Bresnik v. Beulah Park Ltd. Partnership, Inc.* (1993), 67 Ohio St.3d 302, 304, 617 N.E.2d 1096, quoting *State ex rel. Morris v. Sullivan* (1909), 81 Ohio St. 79, 90 N.E. 146, paragraph three of the syllabus. We conclude that R.C. 1701.37 and 1103.16(C) do not abrogate the common-law right to inspection or specifically prohibit shareholders from having access to the corporate records of wholly owned subsidiaries.

{¶ 12} In *State ex rel. Brown v. III Investments, Inc.* (Mo.App.2002), 80 S.W.3d 855, 860, the court stated that nothing in the Missouri statutory code granting a right to shareholders to inspect corporate records "expressly or implicitly abrogates the common law right of inspection." The court concluded by stating, "We find no authority to support the trial court's determination that shareholders in a corporation are never afforded the right to inspect documents of the corporation's subsidiaries in which the shareholder does not directly hold stock." Id. at 865. Similarly, in *Evitt v. Lake Holiday Country Club, Inc.* (1988), 13 Va.Cir. 360, 363, 1988 WL 619347, the court stated that "[t]he statutes on inspection were not to abrogate but to confirm and extend that common law right and their omission of a specific right to inspect books and records of a subsidiary is not fatal."

{¶ 13} Whether shareholders have a right to inspect the corporate minutes of a wholly owned subsidiary of the company in which they own stock is an issue of first impression in Ohio. Accordingly, we look outside Ohio for guidance in resolving the issue.

{¶ 14} "Although there is surprisingly little authority on the matter, the cases considering this issue have divided over whether a shareholder's right of inspection includes the books and records of subsidiary corporations as well." Phillip I. Blumberg, The Increasing Recognition of Enterprise Principles in Determining Parent and Subsidiary Corporation Liabilities (1996), 28 Conn.L.Rev. 295, 340. There are, however, "a number of cases in which the shareholder's right to inspect books and records has been extended to cover the books and records of a subsidiary." Melvin Aron Eisenberg, Megasubsidiaries: The Effect of Corporate Structure on Corporate Control (1971), 84 Harv.L.Rev. 1577, 1595, fn. 92, citing

*Woodworth v. Old Second Natl. Bank* (1908), 154 Mich. 459, 117 N.W. 893; *State ex rel. United Brick & Tile Co. v. Wright* (1936), 339 Mo. 160, 95 S.W.2d 804; *Siravo v. Sirian Lamp Co.* (1940), 124 N.J.L. 433, 12 A.2d 682; *Bailey v. Boxboard Prods. Co.* (1934), 314 Pa. 45, 170 A. 127; *Williams v. Freeport Sulphur Co.* (Tex.Civ.App.1930), 40 S.W.2d 817. "It has generally been held that shareholders in a corporation are entitled at common law to inspect the books and records of a corporation which is a subsidiary to the corporation in which they hold stock." Annotation, What Corporate Documents Are Subject to Shareholder's Right To Inspection (1978), 88 A.L.R.3d 663, 676, Section 8. "Since access to the information concerning subsidiaries is directly related to the rationale for recognition of the basic right of inspection, the better view would uphold inspection." Blumberg, 28 Conn.L.Rev. at 340–341.

{¶ 15} Our review of cases leads us to adopt the general view that shareholders have a common-law right to inspect corporate records of a wholly owned subsidiary of the company in which they own stock where the separate corporate existence of the subsidiary corporation should be disregarded. In *Woodworth v. Old Second Natl. Bank,* 154 Mich. at 468, 117 N.W. 893, the Supreme Court of Michigan allowed a shareholder to inspect a subsidiary's records after concluding that the subsidiary was a mere instrumentality of the parent corporation. In *Bailey v. Boxboard Prods. Co.,* the Pennsylvania Supreme Court stated that " 'the stockholders of one company have a right to inspect the books and records of subsidiary companies where the latter are so organized and controlled, and their affairs so conducted, as to make them adjuncts or instrumentalities of the [parent company].' " Id., 314 Pa. at 47–48, 170 A. 127, quoting 14 Corpus Juris (1919) 859, and citing *Martin v. D.B. Martin Co.* (1913), 10 Del.Ch. 211, 88 A. 612, and *Woodworth,* supra. See William T. Blackburn, Shareholder Inspection Rights (1958), 12 Sw.L.J. 61, 64 ("The rule seems to be that [a shareholder] can inspect the books of the subsidiary corporation if the subsidiary is dominated and controlled by the parent, the extent of the control being the determinative fact" [footnote omitted] ).

{¶ 16} 18A Am.Jur.2d (1985), Corporations, Section 400 states:

{¶ 17} "Courts have generally recognized, both at common law and under statute, the right of shareholders to inspect the corporate documents of a corporation which is the subsidiary of the corporation in which the shareholders hold stock. In such cases a court will disregard the legal fiction of separate and distinct corporate entities. Thus, it has been held that stockholders of a corporation were entitled to inspect the records of a controlled subsidiary corporation which used the same offices and had identical officers and directors. Indeed, it has been suggested that greater liberality should be accorded one seeking inspection of the books and records of a subsidiary than in a situation in

which the question of whether or not a parent corporation is liable for the tort of its subsidiary is before the court." (Footnotes omitted.)

{¶ 18} 5A Fletcher Cyclopedia of the Law of Private Corporations (1995), Section 2230 states:

{¶ 19} "[I]n order for shareholders of the parent to establish their rights to inspect the books and records of the subsidiary, they must make some showing of identity or misuse of the corporate form which will justify the disregard of the separate corporate existence of the two entities."

{¶ 20} Today we adopt the majority rule and hold that, in Ohio, shareholders have a right at common law to inspect the records of a wholly owned subsidiary of the corporation in which they own stock when the parent corporation so controls and dominates the subsidiary that the separate corporate existence of the subsidiary should be disregarded. This right, always important, takes on a new significance in light of recent high-profile corporate scandals involving financial misdeeds. See Kathleen F. Brickey, From Enron to WorldCom and Beyond: Life and Crime after Sarbanes–Oxley (2003), 81 Wash.U.L.Q. 357. Those charged with protecting shareholders, such as investment banks, accountants, and lawyers, have not always been up to the task. See Gary J. Aguirre, The Enron Decision: Closing the Fraud–Free Zone on Errant Gatekeepers? (2003), 28 Del.J.Corp.L. 447. The common-law right to inspect gives shareholders additional opportunities to ferret out misdeeds and contributes to corporate transparency. Whether inquisitive shareholders could have prevented the worst offenses of the Enron scandal and others will never be known, but that was the purpose behind the right from the very beginning.

{¶ 21} We must now determine whether the facts in this case support a finding that the company so controls and dominates the bank that the separate corporate existence of the bank should be disregarded.

{¶ 22} The Supreme Court of Pennsylvania has stated:

{¶ 23} "[T]he facts indicate the Paper Company is merely a controlled subsidiary, using the same offices as Boxboard Company and having identical officers and directors. The rule is clear that 'the stockholders of one company have a right to inspect the books and records of subsidiary companies where the latter are so organized and controlled, and their affairs so conducted, as to make them adjuncts or instrumentalities of the former Company.'" *Boxboard Prods. Co.,* 314 Pa. 45, 170 A. at 127–128, quoting 14 Corpus Juris 859.

{¶ 24} In *Carapico v. Philadelphia Stock Exchange, Inc.* (Del.Ch.2000), 791 A.2d 787, 793, the court determined that common central management alone is not a proper basis for disregarding separate corporate existence. In *Salovaara v. SSP, Inc.* (Jan. 10, 2001), Del.Ch. No. 18903, the court granted the sharehold-

ers the right to inspect the books and records of a corporation's subsidiaries after finding that the subsidiaries were alter egos of the parent.

{¶ 25} In this case, we conclude that the separate corporate existence of the bank should be disregarded. The company owns all of the stock of the bank and has no assets other than the bank. The company and the bank have the same directors. All of the officers of the company are also officers of the bank. The company and the bank hold shareholders' meetings on the same day and at the same place. All of the income of the company is derived from dividends paid by the bank. It is abundantly clear from reviewing the record that the company is the bank and that in this case, the bank's separate corporate existence should be disregarded.

Judgment reversed.

RESNICK and LUNDBERG STRATTON, JJ., concur.

O'CONNOR, J., concurs separately.

MOYER, C.J., F.E. SWEENEY and O'DONNELL, JJ., dissent.

_____

**O'CONNOR, J., concurring.**

{¶ 26} Under the limited facts before us, I concur with the majority opinion. The determinative fact of this case is that the sole business purpose of the holding company was to own the bank. If the holding company controlled multiple subsidiaries or conducted banking operations on its own, the case would present a closer question. Here, the only apparent reason to own part of the holding company is to own the bank. This, combined with the identity of the directors and officers of the two companies, weighed heavily in arriving at the judgment announced today.

_____

**O'DONNELL, J., dissenting.**

{¶ 27} Treatment of the bank in this case as the alter ego of Croghan Bancshares, Inc. represents an unprecedented departure from the traditional application of the alter-ego doctrine. A review of cases from across the country reveals that courts are reluctant to disregard the separate corporate existence of a subsidiary company that conducts its business in corporate form. The facts of this case demonstrate the existence of a classic parent-subsidiary corporate relationship and do not support the majority's conclusion that Croghan "so controls and dominates the [bank] that the separate corporate existence of the

subsidiary should be disregarded." The reach of today's decision will disturb the separate corporate existence of a wholly owned subsidiary and, I believe, adversely affect the conduct of business in Ohio. Accordingly, I dissent because the syllabus does not set forth the proper test to be applied in considering when to disregard the separate corporate existence of a subsidiary corporation.

{¶ 28} This is a matter of first impression in Ohio, and we should, I think, carefully and completely set forth the test to be applied when a shareholder seeks to examine books and records of a subsidiary corporation so that all courts of our state will know what factors should be considered in pondering further challenges in other cases. We should adopt the two-part standard utilized in virtually every jurisdiction that has considered the issue: the right of a shareholder of a parent corporation to inspect the books and records of a corporation does not include the right to inspect the books and records of a wholly owned subsidiary absent a showing of fraud or that the subsidiary is the alter ego of the parent corporation.

## I

{¶ 29} The right of a shareholder to inspect the books and records of a corporation is a fundamental right incident to corporate ownership, which has been recognized at common law, see, e.g., *Whitney v. Am. Shipbuilding Co.* (1912), 14 Ohio N.P. (N.S.) 12, 23 Ohio Dec. 1, 1912 WL 877, and is now provided for in Ohio by statute. R.C. 1701.37 provides:

{¶ 30} "(C) Any shareholder of the corporation, upon written demand stating the specific purpose thereof, shall have the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the articles of the corporation, its regulations, its books and records of account, minutes, and records of shareholders aforesaid, and voting trust agreements, if any, on file with the corporation, and to make copies or extracts thereof."

{¶ 31} More specifically, R.C. 1103.16 provides for the inspection right of those who are shareholders of a bank. It states:

{¶ 32} "(C) Any shareholder of the bank, upon written demand stating the specific purpose of the demand, has the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the books and records of the bank, except books and records of deposit, agency or fiduciary accounts, loan records, and other records relating to customer services or transactions."

## A. COMMON LAW

{¶ 33} A review of common-law cases where shareholders asserted rights to inspect records of a subsidiary indicates that courts have consistently applied the same test for allowing inspection of the records of a subsidiary corporation: cases

involving fraud or a showing that such entities are so controlled as to be adjuncts or instrumentalities of the parent.

{¶ 34} For example, in *State ex. rel. Rogers v. Sherman Oil Co.* (1922), 31 Del. 570, 117 A. 122, where a subsidiary was 94 percent owned by the parent, the court denied the shareholder's request to examine the records of the subsidiary because the court concluded that "the two companies are legally separate and independent entities; that the directors and officers are entirely distinct; that all the books and papers are kept, not only in different offices, but in different states, and far apart. It is averred in the return that the [parent] acquired its stock in the [subsidiary] purely as an investment; that it has had nothing to do with the financing, management or control of said company, which was and is a going concern, having a profitable business and making gains which could be applied to dividends." Id., 31 Del. at 577–578, 117 A. 122.

{¶ 35} And in *Woodworth v. Old Second Natl. Bank* (1908), 154 Mich. 459, 468, 117 N.W. 893, where a shareholder sought to inspect the records of a bank in which he owned shares, and also of the bank's subsidiary in which he held stock, that he had not paid for and which had not been delivered to him, the court permitted inspection after concluding that the subsidiary was a mere instrumentality of the parent corporation. It noted that all of the stockholders of the bank had at least an equitable interest in the subsidiary, the directors of the bank had made the plaintiff a stockholder, director, and president of the subsidiary, the shareholder had the same interest in it as any of the directors, and none of them had paid value for their stock.

{¶ 36} Finally, in *Bailey v. Boxboard Prods. Co.* (1934), 314 Pa. 45, 170 A. 127, the court stated, " 'the stockholders of one company have a right to inspect the books and records of subsidiary companies where the latter are so organized and controlled, and their affairs so conducted, as to make them adjuncts or instrumentalities of the [parent company].' " Id. at 47–48, 170 A. 127, quoting 14 Corpus Juris (1919) 859, and citing *Martin v. D.B. Martin Co.* (1913), 10 Del.Ch. 211, 88 A. 612, and *Woodworth,* supra.

## B. STATUTORY ANALYSIS

{¶ 37} In interpretation of statutes, courts have extended this right to inspect only if the circumstances warrant a disregard of separate corporate existence.

{¶ 38} For example, in *Saito v. McKesson HBOC, Inc.* (Del.2002), 806 A.2d 113, where a shareholder claimed a right to inspect the books and records of a subsidiary corporation under 8 Del.Code 220, a statute worded similarly to R.C. 1701.37,[1] the court applied the following rule: shareholders of a corporation are

---

1.  {¶ a} The Delaware statute states:

not entitled to inspect a subsidiary's books and records " '[a]bsent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent.' " Id. at 118, quoting *Skouras v. Admiralty Enterprises, Inc.* (Del.Ch.1978), 386 A.2d 674, 681.

{¶ 39} In *Skouras,* a shareholder claimed that his statutory right of inspection extended to the corporation's wholly owned subsidiaries because of a close relationship between the parent and the subsidiary corporations both as to management and policymaking. Concluding that "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity," the court denied access. Id. at 681. See, also, *Carapico v. Philadelphia Stock Exchange, Inc.* (Del.Ch.2000), 791 A.2d 787, in which the court determined that "common central management alone is not a proper basis for disregarding separate corporate existence"; because nothing in the record warranted a disregard of the separate corporate existence of the subsidiary, the shareholder had no right to inspect the books and records of the subsidiary corporation. Id. at 793.

{¶ 40} This Delaware rule has also been adopted and applied in Illinois. In *S. Side Bank v. T.S.B. Corp.* (1981), 94 Ill.App.3d 1006, 50 Ill.Dec. 369, 419 N.E.2d 477, a shareholder claimed the right to inspect the books and records of a 90–percent–owned subsidiary under an Illinois statute.[2] The court, citing *Skouras,* 386 A.2d 674, concluded that the shareholder had failed to state a claim because the complaint contained no allegations that the subsidiary was either an alter ego of its parent or that fraudulent transactions had occurred. Id. at 1009–1010, 50 Ill.Dec. 369, 419 N.E.2d 477. Also, in *Logal v. Inland Steel Industries, Inc.* (1991), 209 Ill.App.3d 304, 154 Ill.Dec. 152, 568 N.E.2d 152, a shareholder claimed a statutory right to inspect the books and records of a subsidiary. The court there, citing *S. Side Bank,* supra, concluded that the shareholder's allegation that a parent corporation and its subsidiary shared the same board of directors, officers, principal office, and trademark did not state a claim under the alter-ego

---

{¶ b} "Any stockholder * * * shall, upon written demand under oath stating the purpose thereof, have the right * * * to inspect for any proper purpose and to make copies and extracts from:
{¶ c} "(1) The corporation's stock ledger, a list of its stockholders, and its other books and records." 8 Del.Code 220(b).

2. {¶ a} At the time of the *S. Side Bank* decision, 32 Ill.Rev.Stat. 157.45 (1979) stated:
{¶ b} "Any person who shall have been a shareholder of record or the holder of a Voting Trust Certificate for at least six months immediately preceding his demand or who shall be the holder of record of at least five per cent of all the outstanding shares of a corporation, shall have the right to examine, in person, or by agent or attorney, at any reasonable time or times, for any proper purpose, its books and records of account, minutes and records of shareholders and to make extracts therefrom." This provision, materially unchanged for purposes of this decision, is now found at 805 Ill.Comp.Stat. 5/7.75(b).

theory warranting a right to inspect the subsidiary's books and records. *Logal* at 309–311, 154 Ill.Dec. 152, 568 N.E.2d 152.

{¶ 41} Further, in a California case, the court applied a similar rule and denied a shareholder access to the books and records of a subsidiary corporation. See *Lisle v. Shipp* (1929), 96 Cal.App. 264, 267, 273 P. 1103, where the shareholder had no right to inspect because "the two corporations [were] in fact separate and distinct entities."

{¶ 42} Consistent with these holdings, courts have allowed shareholders of a parent corporation to inspect the books and records of a subsidiary upon a showing that their separate corporate existences should be disregarded because of fraud or because the subsidiary corporation is a mere alter ego of a parent corporation.

{¶ 43} In *Williams v. Freeport Sulphur Co.* (Tex.Civ.App.1930), 40 S.W.2d 817, 825, the court allowed inspection of the books and records of a corporation's wholly owned subsidiary after concluding that the subsidiary corporation was dominated and controlled by its parent corporation in all of its business activities, in that the parent company owned all the subsidiary's stock, fixed and paid the salaries of the subsidiary's officers, declared the payment and amount of the subsidiary's dividends, and disposed of all the income of the subsidiary company. Finally, in *Landgarten v. York Research Corp.* (Del.Ch.1988), 1988 WL 7392, at * 4, the court allowed the inspection of a subsidiary's books and records regarding two specific matters where the evidence suggested a possibility of fraud.

{¶ 44} In the instant case, because the Danzigers have not alleged fraud in their complaint, I would assert that the dispositive issue for this court should be limited to a determination of whether the bank is or is not the mere alter ego of Croghan. Although no Ohio court has established criteria for this determination, other courts across the country have developed some general principles for determining when separate corporate existence should be disregarded.[3]

{¶ 45} For example, in *United States v. Walton* (C.A.6, 1990), 909 F.2d 915, 928, the Sixth Circuit determined that an individual owner and his company were jointly and severally liable for taxes and penalties owed by each, after considering

---

3. These cases do not necessarily involve shareholder inspection rights. In fact, courts have applied the alter-ego doctrine to cases involving shareholder/corporate liability, tax liability, and alimony payments. These cases therefore consider not only whether one company is the alter ego of another but also whether continued recognition of the separate corporations would cause an injustice to a third party. Although the Danzigers' request to inspect the books and records of the bank does not involve shareholder or corporate liability, all cases that consider the alter-ego doctrine employ essentially the same analysis. And because no question of liability exists in this case, this court must consider only whether the separate corporate existence of the bank should be disregarded; it need not address whether recognition of the corporate formalities causes an injustice to a third party.

"a number of criteria in determining whether a corporation is an alter ego justifying piercing the corporate veil[:] * * * (1) the absence of normal corporate formalities, *see, e.g., Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984); (2) commingling of personal and corporate funds, *see, e.g., Labadie Coal Co. v. Black,* 672 F.2d 92, 98 (D.C.Cir.1982); (3) siphoning of corporate funds by a dominant stockholder, *see, e.g., Solomon v. Klein,* 770 F.2d 352, 353–54 (3rd Cir.1985); and (4) the fact that the corporation is merely a facade for the personal operations of the dominant stockholder, *see, e.g., Solomon v. Klein,* 770 F.2d at 354; *Labadie Coal Co. v. Black,* 672 F.2d at 97."

{¶ 46} Similarly, in *Logal v. Inland Steel Industries, Inc.,* 209 Ill.App.3d at 310, 154 Ill.Dec. 152, 568 N.E.2d 152, the court considered the following factors presented by the plaintiff to prove that the subsidiary constituted an alter ego of the parent: "(1) Company's [the subsidiary's] board of directors in 1985 were exactly the same persons as were on Industries' [the parent's] board of directors in 1986; (2) eight out of nine of Industries' officers in 1986 were officers of Company in 1985; (3) the president, chairman and chief executive officer of both Industries and Company in 1987 and 1988 were the same persons; (4) Industries and Company have their principal office in Chicago; (5) Industries issued stock certificates to plaintiff on Company's certificates by merely placing a stamp across old Company stock certificates that stated: 'This certificate represents shares of common stock, $ 1.00 par value, of Inland Steel Industries, Inc.'; (6) Industries issued stock under Company's employee stock purchase plan; and (7) Company and Industries use the same trademark." The Illinois court there concluded that the plaintiffs had *not* demonstrated that one corporation was the alter ego of the other or that the corporate formalities should be disregarded. Id. at 310–311, 154 Ill.Dec. 152, 568 N.E.2d 152.

{¶ 47} Further, in *Doughty v. CSX Transp., Inc.* (1995), 258 Kan. 493, 905 P.2d 106, an injured worker sued the parent corporation of his employer for benefits pursuant to the Federal Employers' Liability Act. To hold the parent company liable, the court explained, the plaintiff "must prove that [the parent company], a railroad, is the alter ego of [the subsidiary-employer] and that an injustice or inequity exists." Id. at 496, 905 P.2d 106. In deciding whether to pierce the corporate veil, the court listed ten factors to be considered[4] but concluded that

---

4. The court listed the following factors: "(1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a

the "ultimate test for imposing alter ego status is whether, from all of the facts and circumstances, it is apparent that the relationship between the parent and subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties." Id., 258 Kan. at 500, 905 P.2d 106.

{¶ 48} In *Saeks v. Saeks* (1985), 24 Ohio App.3d 67, 24 OBR 122, 493 N.E.2d 280, the Second District affirmed the trial court's decision to treat a husband's corporation as his alter ego and therefore to treat the corporation's income as his own for purposes of calculating alimony. The court explained that the corporate formalities may be disregarded in situations "where, as here, the corporation has no separate identity from its shareholder, has no 'mind of its own' (that is, the shareholder exerts complete control), and where the result of recognition of the corporation would be inequitable or unjust or result in an injury or unjust loss, or derogation of the rights of another party." Id. at 70, 24 OBR 122, 493 N.E.2d 280.

{¶ 49} The Texas Supreme Court has also recognized a similar rule. See *Gentry v. Credit Plan Corp. of Houston* (1975), 528 S.W.2d 571. There, the court concluded that the separate corporate existence of the parent and subsidiary must be disregarded because the parent used the subsidiary as a conduit through which it conducted its own business.

{¶ 50} Finally, in *Skouras*, 386 A.2d 674, a shareholder claimed that his statutory right of inspection of the books and records extended to the corporation's wholly owned subsidiaries because of a close relationship between the parent and the subsidiary corporations both as to management and policymaking. Concluding that "[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity," the court denied the shareholder access to the books of the subsidiary corporation. Id. at 681.

{¶ 51} Based on the foregoing, I believe that our court should consider a broad and inclusive list of factors in deciding whether Croghan so dominates and controls the bank that one is the alter ego of the other or that the two companies are in fact a single business entity or, to borrow language from the Texas Supreme Court, whether the "management and operations are assimilated to the extent that the subsidiary is simply a name or conduit through which the parent conducts its business." *Gentry*, 528 S.W.2d at 573. And, further, because

department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed." 258 Kan. at 499, 905 P.2d 106, citing *Schmid v. Roehm GmbH* (D.Kan.1982), 544 F.Supp. 272, 275.

"[m]ere control and even total ownership of one corporation by another is not sufficient to warrant the disregard of a separate corporate entity," *Skouras,* 386 A.2d at 681, the Danzigers must demonstrate more than the fact that Croghan owns and controls the bank and that the two entities share common directors.

II

{¶ 52} The undisputed facts in this case reveal that Croghan owns all of the shares of stock of the bank, that the same individuals serve as directors and officers of both companies, that Croghan board meetings occur separately from bank board meetings, that separate records are kept by each company, that the two corporations hold separate shareholders' meetings, and that Croghan's only source of income consists of dividends paid from the bank.[5]

{¶ 53} These facts viewed alone, or considered as a whole, do not support the majority's conclusion that Croghan and the bank should be treated as one entity, resulting in Croghan's shareholders being able to inspect the bank's records. None of these facts demonstrate that the bank is the mere alter ego of Croghan. In reality, these facts demonstrate separate corporate identity: separate meetings, separate record keeping, separate shareholder meetings, different assets owned and held by each corporation, different income streams, and the purely passive income Croghan derives from its stock ownership compared with income the bank derives from engaging in banking activities, such as commercial, personal, or mortgage lending. Presumably, the agenda for board meetings also differs for each corporation.

{¶ 54} The majority's notion that one corporation is the alter ego of the other, based in part on its ownership of *all* of the shares of the subsidiary, is really not dispositive because, in reality, most holding companies own all or a substantial majority of the shares of any subsidiaries, and a wholly owned subsidiary is, by definition, a subsidiary in which the parent owns all of the subsidiary's shares. Accordingly, that fact alone does not establish that the subsidiary is the mere alter ego of the parent.

{¶ 55} As the Texas Supreme Court noted in *Gentry,* "A subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders." Id., 528 S.W.2d at

---

5. The majority also asserts that Croghan's sole asset is the bank. This is not accurate; Croghan actually owns the *stock* of the bank. It is well settled that "[s]tock is an asset in itself, distinct from the asset that is the issuing company." *Mut. Holding Co. v. Limbach* (1994), 71 Ohio St.3d 59, 60, 641 N.E.2d 1080 (explaining, "In this case, BCBS owns all the outstanding stock of MHC. The MCH stock *and not MHC, the corporate entity,* is BCBS's asset" [emphasis added]). The bank, of course, has its own assets, but there is no suggestion that its assets have been commingled with the assets of Croghan.

573. See, also, *Logal,* 209 Ill.App.3d at 310, 154 Ill.Dec. 152, 568 N.E.2d 152: "Illinois has long held that the separate corporate existence of two corporations may not be disregarded merely because one of the corporations owns the stock of the other, the two share officers, or occupy the same office space. (*Sumner Realty Co. v. Willcott* (1986), 148 Ill.App.3d 497, 501–02, 101 Ill.Dec. 966, 969, 499 N.E.2d 554, 557.) Indeed, these practices are common and exist in most parent-subsidiary relationships. (*Main Bank v. Baker* (1981), 86 Ill.2d 188, 204–05, 56 Ill.Dec. 14, 21, 427 N.E.2d 94, 101.) *To hold otherwise would render virtually every subsidiary the alter ego of its parent.*" (Emphasis added.)

{¶ 56} The majority also seems to blur the distinction between corporate control incident to stock ownership and control of day-to-day operations of a subsidiary's business. As the United States Supreme Court has observed, "it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders * * * will not create liability beyond the assets of the subsidiary. That "control" includes the election of directors, the making of by-laws * * * and the doing of all other acts incident to the legal status of stockholders.'" *United States v. Bestfoods* (1998), 524 U.S. 51, 61–62, 118 S.Ct. 1876, 141 L.Ed.2d 43 (discussing general corporate law in its application of the federal Comprehensive Environmental Response, Compensation, and Liability Act and distinguishing between a parent corporation's supervision of a subsidiary and its "operation" of the subsidiary), quoting William O. Douglas & Carrol M. Shanks, Insulation from Liability Through Subsidiary Corporations (1929), 39 Yale L.J. 193, 196.

{¶ 57} In this case, the Danzigers have failed to demonstrate that Croghan controls the day-to-day operations of the bank's business; rather, they have merely demonstrated that Croghan exercises control incident to its status as the sole shareholder of the bank. This fact does not justify disregarding the bank's separate corporate existence.

{¶ 58} Next, longstanding precedent recognizes two separate corporations despite the fact that the same individuals occupy positions as members of the board of directors of each corporation. In *Carapico v. Philadelphia Stock Exchange, Inc.,* 791 A.2d at 793, the court determined that "common central management alone is not a proper basis for disregarding separate corporate existence" and that nothing in the record warranted a disregard of the separate corporate existence of the subsidiaries. See, also, *Skouras,* 386 A.2d at 681 ("Absent a showing of a fraud or that a subsidiary is in fact the mere alter ego of the parent, a common central management alone is not a proper basis for disregarding separate corporate existence").

{¶ 59} Similarly, in *Logal,* supra, the court concluded that the shareholder's allegation that a parent corporation and its subsidiary shared the same board of directors, officers, principal office, and trademark did not state a claim under the

alter-ego theory warranting a right to inspect the subsidiary's books and records. Id., 209 Ill.App.3d at 310–311, 154 Ill.Dec. 152, 568 N.E.2d 152.

{¶ 60} The New Jersey Supreme Court has held that, under the common law, a subsidiary did not constitute the alter ego of the parent corporation despite the fact that the parent owned all of the stock of the subsidiary, the companies shared the same directors, the subsidiary's board met in the parent's offices, the parent "created [the subsidiary] for the sole purpose of acquiring and operating [a] mercury processing business and that, as the trial court found, '[the parent's] personnel, directors, and officers were constantly involved in the day-to-day business' of [the subsidiary]." *New Jersey Dept. of Environmental Protection v. Ventron Corp.* (1983), 94 N.J. 473, 501, 468 A.2d 150. (The court ultimately did hold the parent company liable for violations of environmental laws—but only because of specific statutory language unrelated to the common-law alter-ego doctrine. Id. at 501–503, 468 A.2d 150.) See, also, Douglas & Shanks, supra, 39 Yale L.J. at 196 ("The fact that the constitution and organization of the management of each are the same does not mean that the business identities of the two units are assimilated").

{¶ 61} Accordingly, the viewpoint held by the majority here is unique in holding that because the same individuals hold positions on the boards of two corporations and have separate meetings on the same day, the one corporation is the alter ego of the other. All the evidence here suggests the separate corporate existence of the bank and Croghan: the fact that one corporation holds a board meeting following the other does not give rise to an inference of sameness. Rather, it highlights the fact that two different corporations have separately conducted business in separate meetings in corporate form: each would separately record in its minute book the business it conducted and transact such business as necessary, distinct from the business of the other corporation.

{¶ 62} Finally, I believe that the evidence that Croghan derives all of its income from dividends tends to prove that these two corporations act independently and in accord with requisite corporate formalities, and I think it demonstrates that the majority's conclusion to disregard the bank's separate corporate existence is not well taken. Plainly, the passive income Croghan derived from dividends is different from the income derived by the bank in the normal course of conducting banking operations. Hence, the majority's conclusion that these corporations are the same entities is, in my view, faulty because income derived from conducting banking activities is different from the passive dividend income derived from the ownership of shares of stock.

### III

{¶ 63} A comparison of the facts before us and the facts before the Texas Supreme Court in *Gentry,* supra, demonstrates the majority's unprecedented

application of the alter-ego doctrine to the facts of this case. In *Gentry,* the court upheld the finding that a subsidiary, Credit Plan Corporation of Houston, constituted the mere alter ego of its parent, Colonial Finance Corporation, because the facts revealed a relationship among the companies that went beyond stock ownership, a duplication of some or all of the directors or officers, and the exercise of the control incident to stock ownership. *Gentry,* 528 S.W.2d at 573–575. The court there concluded that the parent company did not simply own and manage Credit Plan but, rather, it used it to carry out its business. The Texas court reached this conclusion after considering the following: the same persons served as officers and directors of both Colonial and Credit Plan; Colonial owned a management corporation that performed management functions for all of the Colonial subsidiaries, including maintaining the books, records, and accounts of both Colonial and Credit Plan; Colonial and its subsidiaries maintained the same corporate office and had the same registered agent; the directors of Colonial and Credit Plan met at the same time and place; Colonial and Credit plan carried out the same business and their charters contained "the same or similar purpose clauses"; one individual was president of both Colonial and of each subsidiary, and he selected the managers for each office; managers were transferred from one office to another; consolidated tax returns were filed for Colonial and its subsidiaries; consolidated balance sheets documented the operations of the parent company and its subsidiaries; the minutes of Colonial board meetings showed that the subsidiaries "were regarded not as separate business entities but as simply offices of the parent company"; and an executive committee met every 90 days to discuss business of Colonial and its subsidiaries. *Gentry,* 528 S.W.2d at 573–574.

{¶ 64} After considering these factors, the court held that "all of the evidence points to one conclusion: that *Credit Plan was operated and used by Colonial not as a separate entity but simply as a name under which Colonial did its business.* There is no evidence to the contrary." (Emphasis added.) Id. at 575.

{¶ 65} In the instant case, no such domination exists: Croghan is a holding company, which is defined as "[a] company formed to control other companies, usu[ally] confining its role to owning stock and supervising management." Black's Law Dictionary (8 Ed.2004) 298. And in Ohio, holding companies may be formed for this purpose. See R.C. 1701.03(A) ("A corporation may be formed under this chapter for any purpose or combination of purposes for which individuals lawfully may associate themselves").

{¶ 66} Further, as the Illinois Supreme Court has observed, "Ownership of capital stock in one corporation by another does not, itself, create an identity of corporate interest between the two companies, nor render the stockholding company the owner of the property of the other, nor create the relation of

principal and agent, representative, or alter ego between the two. *United States v. Delaware, Lackawanna & Western Railroad Co.,* 238 U.S. 516, 35 S.Ct. 873, 59 L.Ed. 1438; *Pullman's Palace–Car Co. v. Missouri Pacific Railway Co.,* 115 U.S. 587, 6 S.Ct. 194, 29 L.Ed. 499; *Owl Fumigating Corp. v. California Cyanide Co.,* D.C. [1928], 24 F.2d 718; *Richmond Irvine Construction Co. v. Richmond, Nicholasville, Irving & Beattyville Railroad Co.,* 6 Cir. [1895], 68 F. 105, 34 L.R.A. 625. Nor does the identity of officers of two corporations establish identity of the corporations. *Owl Fumigating Corp. v. California Cyanide Co.,* supra." *Superior Coal Co. v. Dept. of Fin.* (1941), 377 Ill. 282, 289, 36 N.E.2d 354 (denying the subsidiary's request to disregard its separate corporate existence, which would have given the company a tax break).

{¶ 67} Therefore, Croghan's business as a holding company is to hold a controlling share in other companies and to derive its income from the dividends of the shares. The bank's business is to operate the bank. The record does not show that Croghan conducts a banking business or that it uses the bank as a conduit. Nor is there any evidence that Croghan runs the day-to-day operations of the bank or that it treats the bank as a mere division of its company. Rather, as the Danzigers concede, the bank is simply a wholly owned *subsidiary* of Croghan.

{¶ 68} Further, the Danzigers have not shown (1) that Croghan and the bank are ignoring the corporate formalities, (2) that the bank is undercapitalized, or (3) that Croghan and the bank are commingling funds or assets. See, e.g., *Walton* and *Logal,* supra. They have not shown that Croghan's "[d]ominion [is] so complete, [and its] interference so obtrusive" that the bank's separate corporate existence should be disregarded. *Berkey v. Third Ave. Ry. Co.* (1926), 244 N.Y. 84, 95, 155 N.E. 58. They have demonstrated only the existence of a parent-subsidiary relationship, which necessarily entails some supervision of the subsidiary by the parent. Simply put, they have merely demonstrated that Croghan *owns* shares in the bank, that the two have identical board members, and that they meet separately on the same day. They have not shown that Croghan operates the bank or uses the bank as a separate entity under which it conducts its business; they have not shown this because no evidence exists to support it.

## IV

{¶ 69} Although this case involves merely the request by shareholders to inspect the books and records of a wholly owned subsidiary, the majority's unprecedented application of the alter-ego doctrine may have unintended consequences as this doctrine is applied to shareholder and corporate liability.

{¶ 70} In *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.* (1993), 67 Ohio St.3d 274, 617 N.E.2d 1075, this court established a three-pronged test with respect to whether to disregard corporate formalities and hold share-

holders liable for the wrongs committed by the corporation. Pursuant to *Belvedere,* "[t]he corporate form may be disregarded and individual shareholders held liable for wrongs committed by the corporation when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." Id. at paragraph three of the syllabus.

{¶ 71} The first part of the *Belvedere* test requires courts to consider whether one corporation is the alter ego of the other. With today's majority opinion, standards of the first part of the *Belvedere* test are lowered, and the separate corporate existence of *any* subsidiary corporation may be disregarded by courts considering claims against parent companies or individual shareholders. Essentially, after today's decision, any parent corporation owning a subsidiary corporation that exercises control over that entity incident to its ownership, with a shared board of directors who meet on the same day, could be treated as a single corporation. This is a dramatic departure from recognized law throughout the United States and will further distinguish Ohio as a state where corporations will be less likely to conduct business in this form.

{¶ 72} Finally, the majority's stated interest in "protecting shareholders" is undermined, in my view, by the far reach of today's decision, which will affect thousands of sole shareholders who run their own companies in corporate form as much as it will affect every larger corporate entity.

V

{¶ 73} In my view, the Danzigers have shown nothing more than the existence of a parent-subsidiary corporate relationship between Croghan and the bank. Therefore, I would hold that, because they have demonstrated neither fraud nor that one corporation is the alter ego of the other, the separate corporate existence of the bank should not be disregarded, and the Danzigers, as non-shareholders of the bank, may not examine its books and records.

MOYER, C.J., and F.E. SWEENEY, J., concur in the foregoing dissenting opinion.

---

Jared E. Danziger, Nathan G. Danziger and Samuel R. Danziger, pro se.

Vorys, Sater, Seymour & Pease, L.L.P., Thomas B. Ridgley and John C. Vorys, for appellee.